[No. F062682. Fifth Dist. Dec. 16, 2011.]

In re XAVIER R. et al., Persons Coming Under the Juvenile Court Law.
TULARE COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Plaintiff and Respondent, v.
LINDA M., Defendant and Appellant.

COUNSEL

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant.

Kathleen Bales-Lange, County Counsel, John A. Rozum and Amy-Marie Costa, Deputy County Counsel, for Plaintiff and Respondent.

OPINION

**GOMES, J.**—Linda M. is the paternal grandmother and legal guardian of brothers Xavier R. and D.R. (collectively the boys). The boys, who have

serious mental and emotional problems, were declared dependents of the juvenile court based on Linda's inability to set proper boundaries for them, as well as her failure to provide them with a stable home environment and appropriate care for their emotional problems. At disposition, Linda was given reunification services. Several months later, the Tulare County Health and Human Services Agency, Child Welfare Services (Agency), filed a motion to terminate Linda's Probate Code guardianship pursuant to Welfare and Institutions Code section 728,[1] as well as a section 388 petition seeking to vest the boys' medical, dental and mental health rights with the Agency and their educational rights with Court Appointed Special Advocates (CASA), and change Linda's visitation orders. The juvenile court granted both the motion to terminate the guardianship and the section 388 petition.

On appeal from those orders, Linda challenges only the order terminating her guardianship. She contends the juvenile court did not have the authority to terminate the guardianship once she was given reunification services unless it first granted a petition to terminate her reunification services under section 388, subdivision (c), and there was insufficient evidence that termination of the guardianship was in the boys' best interests. We reject Linda's claims and affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND

Linda brought the boys to Visalia, California, in late 2003, when Xavier was four and D. was three, after their mother called her from another state and threatened to give the boys away unless Linda came and got them. On April 12, 2005, Linda became the boys' legal guardian through superior court. Between September 2004 and November 2010, the Agency received 20 referrals on the family, but no petitions were filed with respect to these referrals.

On November 1, 2010, the Agency opened a voluntary family maintenance case after receiving numerous referrals from service providers expressing concern regarding Linda's ability to care for and supervise the boys. A "staffing" was held on November 23, 2010, between the Agency and the family's service providers, including Visalia Youth Services (VYS), and the principals of the boys' schools. According to VYS, the boys both had mental health issues and had been prescribed psychotropic medications; 11-year-old Xavier had been diagnosed as bipolar with schizophrenia, while 10-year-old D. had been diagnosed with mood and conduct disorders. The service providers believed the boys were not receiving their medications regularly;

---

[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise stated.

they suspected Linda was taking the medications herself based on the boys' reports to their therapists and school staff. The boys' therapists believed the boys' mental health was deteriorating due to inconsistent medication treatment and an unstable home life.

D. was on informal probation for stealing and being physically assaultive. According to VYS and Family Services of Tulare County, Linda had expressed fear of D., as he had hit her in the past with an open fist, and had recently kicked her and broken her finger. D. also hit and bit Xavier, which behavior Linda was unable or unwilling to stop. The boys were disruptive and disobedient at school. They destroyed school property and hit students and staff. Xavier's school behavior included bullying and punching other students, cursing, tipping over desks, throwing papers and being disrespectful to staff and students.

Although Therapeutic Behavioral Services (TBS) had been tried, the services failed because Linda was resistant to help and would not follow the recommendations of support staff. According to D.'s therapist, the family had received two referrals to TBS, as well as referrals to community resources such as YMCA, anger management and parenting classes, family services, and parenting network. The family moved frequently; according to VYS, they had moved five times in the past three months, which exacerbated the boys' mental health symptoms.

Xavier's school principal reported that he had worked with the family for the past two years and during that time Xavier's behavior had escalated; he was becoming more physical and began defecating in his pants. Xavier told the principal D. would bite him and Linda would curse at him and take his medication. Xavier was suspended frequently from school. A parenting instructor reported that Linda was afraid to tell D. "no" and she did not restrict him from leaving the home or question him about his whereabouts. The instructor observed the boys to be disrespectful and to use profanity toward Linda and the instructor. It was apparent to the instructor that Linda was afraid to discipline the boys, she had little to no control over their actions, and due to her fear of retaliation, she was either unable or unwilling to tell them no.

On December 1, 2010, the Agency filed a dependency petition, which was amended on December 6. The amended petition alleged the boys came within the provision of section 300, subdivisions (b) (failure to protect), (c) (serious emotional damage) and (g) (no provision for support). The allegations were based on Linda's inability to (1) set proper boundaries and limits that, due to the boys' inability to adequately protect themselves from harm and neglect, endangered their physical safety and emotional health and well-being, (2)

provide the boys with the basic necessities of life or a stable home environment, which endangered their physical safety and emotional health and well-being, and (3) provide appropriate care for the boys' serious emotional problems, as Linda was inconsistent with providing the boys with their prescription psychotropic medications. The petition further alleged the boys' mother and father left them without provision for support as their whereabouts were unknown despite reasonable efforts to locate them.

The boys were detained and placed together in an intensive treatment foster care home. Linda told the social worker she had done everything she knew to get the boys the mental health services they needed, and she was willing to do whatever it took to get the boys returned to her care.

Xavier told a social worker, as well as a school psychologist and a teacher, that he did not want to return to Linda's custody or visit her because she choked him when he lived with her. Xavier believed Linda liked D. better than him and punished him more than D. Since being in foster care, Xavier had not asked the social worker about Linda or requested visits with her. Xavier liked his foster home because it is a real home. The social worker reported that Xavier struggles with his behavior at school and according to his individualized educational plan (IEP), his behavior impedes his learning as well as that of his classmates, he is often "defensive" with his peers, and he struggles to stay on task.

D. told the social worker that he is worried Linda would not have money or a place to live since he and his brother were removed from her care. D. wanted to live with Linda again someday, but not until she got a home. The social worker noted that D. frequently brought up the topic of money during visits with Linda, such as asking her if she has any money and how she will get money to survive, and believed D. felt responsible for Linda's welfare.

In a report prepared for a combined jurisdiction and dispositional hearing, the social worker noted that Linda, who was raising the boys on her own, was unemployed and housing was an issue, as the family had moved several times since being evicted from the paternal great-grandmother's home over the summer. Despite the boys' mental health issues and the family's housing struggles, the boys had attended school regularly and received mental health services. They had seen their therapists and been assessed regularly for psychotropic medication. Both of the boys were special education students with IEP's. Linda attended IEP meetings and mental health and medical appointments with the boys. The social worker noted Linda was resourceful and good at soliciting assistance from members of her church, community centers and other charitable organizations.

The social worker reported that while the boys continued to struggle with their behaviors, including profanity, anger and talking back, their foster parent was working toward improving their behaviors. The boys were scheduled to visit Linda twice a week for one hour, but were not forced to participate. Xavier did not want to visit. Linda was appropriate during visits with D., engaging him in conversation and play, and D. enjoyed the visits. The Agency recommended six months of reunification services for Linda, with a permanent plan of guardianship or permanent planned living arrangement should reunification services fail.

At the January 6, 2011[2] jurisdiction hearing, the juvenile court granted Linda's counsel's request for a continuance. The minute order of the hearing states that the court "suggest[ed]" that the Agency and the boys' counsel review section 728 to determine whether a motion would be made to terminate Linda's guardianship, and if either party intended to make such a motion, the court would hear it immediately following the jurisdiction hearing.

A combined jurisdiction and dispositional hearing was held on January 12. The juvenile court struck portions of the first amended petition at the request of the Agency's counsel. Linda submitted on the basis of the social worker's reports, which the juvenile court received into evidence. The juvenile court also took judicial notice of the entire case file. Based on the evidence presented, the juvenile court found the allegations of the amended petition true and that the boys were described by section 300, subdivisions (b), (c) and (g).

The juvenile court proceeded immediately to disposition. It amended Linda's case plan to include an order for her to submit to a psychological evaluation and follow any recommendations. The Agency asked for discretion to increase visits, including the discretion to allow unsupervised visits. The court adopted the findings and orders the Agency submitted as amended, which included removing the boys from Linda's custody and providing her with reunification services. The court advised Linda the likely date by which the boys may be returned was January 12, 2012, and if they could not be returned by that date, a permanency plan could be set to terminate the guardianship and parental rights, and place the boys for adoption. The court gave the Agency discretion to increase the length and frequency of visits, but did not give it discretion to lift supervision until the court reviewed the psychological evaluation by way of a section 388 or other motion. The court set a six-month review hearing for June 22.

---

[2] All further references to dates are to the year 2011, unless otherwise stated.

On January 28, the Agency filed an addendum report notifying the court and parties that Xavier was "5150'd" on January 21 after he become physically aggressive with staff and a student at his school, and complained of auditory and visual hallucinations that told him to hurt and kill people. Prior to this, Xavier was receiving weekly counseling and monthly psychotropic medication monitoring through VYS. He was in a "Special Project Class" at school, comprised of five students with severe emotional/behavioral issues, four adult instructors and three aides, where he received one-on-one instruction throughout the day. Even with close supervision, the week before Xavier was "5150'd" he acted out aggressively in class and kicked the teacher in the shin, injuring her.

On February 2, D. was suspended from school after he assaulted a child there. D.'s foster parents were not willing to take him back into their home, as D. had been very verbally abusive towards his foster mother. Because of D.'s dangerous propensities, there were no foster homes in Tulare County willing to take him, so the Agency placed him in a group home. On February 4, the Agency filed a section 387 supplemental petition with respect to D., recommending modification of his disposition to allow the Agency to place him in an appropriate group home. The Agency reported that on February 1, D. had used aggressive behavior with Agency staff; he became enraged and started slamming doors in the Agency's visiting room, banging his head against the couch and cursing at staff. D. was also caught stealing toys from the Agency's office, used profanity, and told the social worker he would cut off her arms. At a February 7 hearing on the section 387 petition, the juvenile court found the petition's allegations true after Linda submitted on the social worker's report, and authorized a group home placement for D.

A psychological evaluation of Linda was completed in February. Linda reported she and the boys had lived with her mother until September 2010, when her mother said they could no longer live there due to the boys' behavior problems. Linda and the boys then lived with three different friends and did not have a stable residence. After the boys were removed from her custody, Linda moved back in with her mother, as well as her daughter and son-in-law and their two children, ages four and six. Linda reported having money problems which made it difficult for her to live independently.

The psychologist found that Linda tended to deny problems and blame others for her own shortcomings. She did not take responsibility for the boys' detention. When asked what she might need help with, Linda responded that the boys needed counseling and she only needed transportation and housing. The psychologist believed that Linda's lack of insight and history of poor judgment could prevent her from acknowledging her need for assistance in the future, and she may be resistant to treatment and reluctant to draw upon

others for support or knowledge. While Linda had previously been diagnosed with bipolar disorder, Linda denied any symptoms consistent with a manic episode although she acknowledged a history of depressive symptoms. Linda exhibited symptoms consistent with an underlying and pervasive personality disorder leading to a lack of stability in interpersonal relationships, unusual thought patterns, inappropriate affect, and difficulty controlling her anger. Based on the assessment, the psychologist diagnosed her with a personality disorder, not otherwise specified, which did not qualify her for mental health services.

The psychologist recommended that Linda complete parenting classes focused on managing the behavior of troubled or mentally ill children in a healthy and appropriate manner, as well as a child abuse prevention program. The psychologist further recommended Linda attend conjoint therapy sessions with the boys when their treating clinicians deemed this to be beneficial, and she be afforded referrals for housing and assistance in obtaining employment or financial support.

In the beginning of March, the Agency filed the following with respect to the boys: (1) a section 387 petition to change Xavier's disposition to a group home; (2) a motion to terminate Linda's guardianship pursuant to section 728; and (3) a section 388 petition to vest the boys' medical, dental, mental health and educational rights in the Agency and CASA, and to change Linda's visitation orders.

In the section 387 petition, the Agency asserted Xavier's prior placement had been ineffective in protecting him due to his physiological issues, as Xavier suffered from fecal incontinence (encopresis) and involuntary urinary discharge (enuresis). He frequently soiled himself, was unable to properly clean up after himself, and could not use the restroom unassisted. Xavier hid his soiled garments in his bedding and got fecal material on light switches and walls. His behaviors resulted in damaged property and there were no other foster placements willing or able to care for him.

Xavier's behavior had worsened since he was suspended from school on January 21. On February 16, Xavier's foster parent gave 30 days' notice that she would no longer be able to care for Xavier, as his behavior had become extremely overwhelming and "Crisis" had been called twice in seven days. On February 28, Xavier became aggressive when he learned he was going to be in respite care for the weekend; he refused both to get out of the vehicle and to clean himself up when he became agitated. That same day, Xavier's therapist told the social worker he had become extremely agitated within the past week; she felt a group home setting would be better equipped to meet his mental health and medical needs. After all available county foster homes had

declined placement of Xavier, the social worker found placement with a group home in Stockton, California, which had dealt with similar behaviors including encopresis and enuresis.

Xavier told the social worker that he did not want to visit Linda because she used to beat him on a daily basis, and did not want to attend school because the other children made fun of him. According to the foster mother and foster family agency social worker, Xavier became visibly agitated and very aggressive when told he had to visit Linda. While at a scheduled medical appointment, he became aggressive and agitated when he saw Linda from a far distance.

In its section 728 "Notice of Motion re Request to Terminate Legal Guardianship," the Agency requested termination of Linda's legal guardianship, as the guardianship was no longer necessary or in the boys' best interests. The Agency requested the motion be heard after the jurisdictional phase of the section 387 hearing set for Xavier. In its memorandum of points and authorities, the Agency asserted that Linda had been granted a probate legal guardianship of the boys, but she could no longer provide adequate care for them, her excessive verbal and physical abuse caused the boys significant physical harm, and the juvenile court had authority to terminate the probate guardianship under section 728.

In its section 388 petition, the Agency requested that the boys' medical, dental, and mental health rights be vested with the Agency and their educational rights with CASA. The petition further requested termination of Linda's supervised visits with Xavier. With respect to visits with D., the Agency requested the visits not be forced and it be given discretion to terminate them. In support of the section 388 petition, the Agency asserted that on February 25, Xavier could not be seen for a medication evaluation because Linda failed to attend and consent to it. The Agency further asserted that Xavier had become increasingly agitated since being taken off some of his medication while hospitalized on January 21, there was an urgent need to stabilize the boys' mental health needs, and Linda posed a barrier to their treatment plan because she minimized the boys' substantial mental health needs. The Agency was concerned Linda would be unavailable or unable to be located should a medical or mental health emergency arise. In addition, the Agency asserted Linda did not comprehend the boys' educational needs and Xavier's visits with Linda were detrimental.

A social worker explained in a report why the Agency was requesting educational rights be vested with CASA. D. was attending school in Visalia, but living in a group home in Exeter. While Linda agreed D. could attend school in Exeter, that school district did not have a school that would

meet D.'s mental health needs. The social worker spoke with liaisons from both school districts and each had a different opinion on where D. should attend school. The social worker believed D. would benefit from attending a new school environment with VYS participating in the adjustment; she had numerous conversations with the school districts and Linda, and felt Linda was making it very difficult to make appropriate educational decisions because she did not fully comprehend the extent of the boys' educational needs. Xavier was suspended from his special day class on January 21 for hitting and spitting on the teacher, which was his third assault on a teacher. Consequently, the school requested an expulsion hearing. In the meantime, Xavier was attending school for one hour a day at the school district office, but during that hour he would become verbally loud and kick furniture. The teacher did not feel safe and would call in additional staff. A counselor who assisted with transporting Xavier to school reported that Xavier had trouble getting out of the vehicle when they arrived at school, as he did not want to get out and would throw a fit.

On March 4, Xavier's foster parents had arranged for him to go into respite care for the weekend. Xavier refused to get in the van and walked away from the home. The foster mother drove alongside him as he walked, encouraging him to get in, but he refused. The Tulare County Sheriff's Department responded and, after consulting with "Crisis," transported Xavier to the hospital by ambulance for a "5150" evaluation. Eventually, Xavier was placed in respite care for the remainder of the weekend. The social worker could not locate a foster home in Tulare County able to meet Xavier's medical, behavioral, and mental health needs, so the social worker placed Xavier in the Stockton group home on March 7. The social worker called Linda to advise her of this and she did not appear to object. The social worker spoke with a worker at the group home on March 8, who said that Xavier was doing fine and they were in the process of enrolling him into school in Stockton.

A hearing on the section 387 petition with respect to Xavier was held on March 9. The juvenile court found the allegations true after Linda submitted on the reports and all parties agreed to the Agency's recommendation. The juvenile court suspended Linda's rights to make medical, dental, mental health and educational decisions for Xavier, as well as visitation with him, pending the hearing on the section 388 motion, which was set for March 22, the same day as the hearing on the motion to terminate Linda's guardianship and the dispositional hearing on the section 387 petition.

At the March 22 hearing, the juvenile court first addressed the section 388 petition and the motion to terminate the guardianship. The Agency submitted

on its moving papers on the motion to terminate the guardianship and the juvenile court, at the Agency's request, took judicial notice of the entire case file.

Linda testified on her own behalf. After she brought the boys to Visalia, they lived at her mother's house. Linda sent the boys to school and bought their clothes. She recognized the boys had special needs, which she described as emotional and behavioral problems. Linda set up a "504 plan" for them at school and attended IEP meetings. She followed the suggestions of education professionals with respect to the boys, such as helping with their reading and implementing ways to discipline them. Linda also went to VYS to ask for help for the boys' mental health issues, where they received weekly group therapy and individual therapy every other week. Linda spoke with the therapist about the boys' progress, who told her what she could do to help the boys get along. The boys also saw a psychiatrist, who prescribed medications; Linda was present when the psychiatrist prescribed and reviewed medications. Linda was in charge of giving the boys their medications and denied taking the medications herself.

The school would contact Linda when the boys engaged in agitated or aggressive behaviors. When it did so, she would take the boys home and try to find out why they behaved as they did; she was able to calm them by talking with them and explaining things to them. Linda was not officially trained to deal with special needs children, but she had taken child development classes, as well as child psychology and marriage and family counseling, at "COS." Linda claimed she did not attend Xavier's medication appointment on February 25 because she was not notified of the appointment. Linda believed she comprehended the boys' educational needs, as she initiated both the IEP and 504 plan, and had followed through with the Agency's suggestions since the boys were removed from her.

Linda described her visits with the boys as "[v]ery loving, fine, quiet times" and denied they became agitated or aggressive toward her. Linda had not been able to visit Xavier in Stockton, but she did visit D. once a week and characterized their visits as good. When asked about Xavier not wanting to visit her, Linda responded that the visits were not forced and she wanted him to make up his own mind about whether he wanted to visit her.

Linda understood the severity of Xavier's bowel and urination issues, but she did not have any specific training on how to deal with those problems. Linda agreed she needed help with those issues. Linda had attended an expulsion hearing for Xavier and she thought she could help him with his education. She did not object to the professionals being involved; she just wanted to be in contact and notified when it was happening. Linda denied

beating Xavier and claimed she disciplined him by giving him timeouts and taking things away from him.

Linda denied being afraid to tell the boys no, or to set restrictions or boundaries for them. Linda claimed she placed restrictions and limitations on the boys, and did not permit them to come and go as they pleased, as they were in by their curfew. Linda did not agree that she was afraid to discipline the boys or that she had little to no control over their actions. Linda thought Xavier was either making up his claims that Linda beat him or confusing her with his maternal grandmother, who did beat him. Linda claimed Xavier was lying when he told various people that Linda had not given him his medication.

The Agency's attorney argued it was not in the boys' best interests for the guardianship to continue as their mental health and educational issues had gotten progressively worse while in Linda's care and they needed more structure than she could provide. He further argued that Linda did not completely understand the seriousness of the boys' needs and it would be unreasonable to continue their current course. Linda's attorney argued the guardianship should continue, pointing out that it was Linda who got the boys when their mother did not want them, she became their legal guardian despite the boys' serious mental health issues, and she got them help. He further argued that Linda loved the boys and deserved the opportunity to continue as their guardian. The boys' attorney asked the juvenile court to terminate the guardianship, as termination was in the boys' best interests. The juvenile court directed the attorneys to file simultaneous briefs on the standard the juvenile court should use to determine whether to terminate the legal guardianship, stating that it did not see any changes from the time of the dispositional hearing.

Linda's attorney filed a brief asserting that the Agency had brought a section 388 petition to remove Linda as the legal guardian and terminate the probate guardianship, which the juvenile court should deny because the Agency failed to meet its burden of establishing changed circumstances. He argued it remained in the boys' best interests to leave the guardianship intact and for Linda to continue receiving reunification services.

The Agency argued in its brief that it was required to establish by clear and convincing evidence it was in the boys' best interests to terminate the guardianship, and section 728 authorized a hearing on a motion to terminate a probate guardianship in the juvenile court at the disposition hearing or any subsequent hearing, such as the dispositional hearing on the section 387 petition. The Agency also asserted it had shown changed circumstances and that it would in the boys' best interests to terminate the guardianship. The

boys' attorney argued the juvenile court could terminate a probate guardianship if it determined, by clear and convincing evidence, that termination was in the boys' best interests, which standard had been satisfied.

At the April 12 hearing to rule on the section 388 petition, the request to terminate the legal guardianship, and disposition as to the section 387 petition, the juvenile court stated that, as to the section 388 petition, it found there had been a change of circumstances and also found "by clear and convincing evidence that the proposed modification of terminating the legal guardianship is in the best interest of the children. The Court is terminating the legal guardianship at this time."[3] As to disposition for "D[.]," the court authorized a group home placement. The court left on calendar the review hearing set for June. The court vested the right to make medical, dental and mental health decisions for the boys in the Agency, and educational rights in CASA. The court granted Linda supervised visitation with D., but not with Xavier. That same day, the court signed an order after hearing on the section 388 petition which stated the request was granted and "legal guardianship is terminated."

On April 29, the juvenile court held a hearing in chambers in which it stated that its clerk had made it aware of some inconsistencies or concerns regarding the April 12 minute order, which it wanted to clarify for the record. The court explained the clarifications as follows: "The minute order reflects that the 388 petition was granted terminating the legal guardianship. This is incorrect. There was a motion to terminate the legal guardianship. So it should have been that the motion to terminate the legal guardianship was granted, the finding is by clear and convincing evidence as reported in the April 12 minute order. [¶] The Court found and continues to find by clear and convincing evidence that the termination of the legal guardianship is in the best interest of the children. [¶] Furthermore, on the minute order[,] the minute order reflects that as to D[.] the Court authorized group home placement. That should have been as to Xavier rather than D[.] So the minute order of today's date from this chambers conference will show those changes to the April 12, 2011 minute order." The court asked if anyone objected to those corrections. Linda's attorney responded: "No objection." The children's and Agency's attorneys also answered: "No." The court further stated that it had granted the section 388 petition that had been proposed, stating that the minute order accurately reflected how the medical, dental, mental health and educational decisions are vested and the visitation orders made.

---

[3] The minute order of the April 12 hearing states, in pertinent part, that "[a]s to the 388 petition the Court is finding that there has been a change in circumstances. The Court finds by clear and convincing evidence that the proposed modification of terminating the legal guardianship is in the best interest of the children. The Court is terminating the legal guardianship at this time."

## DISCUSSION

Linda contends that once the juvenile court ordered reunification services for her at the dispositional hearing on the dependency petition, the Agency could not seek termination of her Probate Code guardianship unless it first brought a successful section 388 petition to terminate her reunification services. Otherwise, Linda asserts, the Agency could accomplish through the Probate Code what it could not accomplish under the Welfare and Institutions Code. We do not share Linda's view of the pertinent law.

At the outset, we address the Agency's contention that Linda forfeited the right to raise this argument on appeal because she failed to raise it in the juvenile court. While that oversight generally would preclude her from raising the issue on appeal, because the facts surrounding it are not disputed and the issue raises only a question of law, the general rule does not apply. (*Hittle v. Santa Barbara County Employees Retirement Assn.* (1985) 39 Cal.3d 374, 391, fn. 10 [216 Cal.Rptr. 733, 703 P.2d 73].)

It is undisputed that Linda had custody of the boys pursuant to a guardianship of the person established under the Probate Code. Probate Code section 1601 states that a guardianship of the person may be terminated "[u]pon petition of the guardian, a parent, [or] the ward . . . if the court determines that it is in the ward's best interest to terminate the guardianship." (Prob. Code, § 1601.) A guardianship of the person created under the Probate Code may also be terminated by the juvenile court in a Welfare and Institutions Code section 300 dependency proceeding pursuant to section 728. Section 728 states, in pertinent part: "(a) The juvenile court may terminate or modify a guardianship of the person of a minor previously established under the Probate Code, . . . if the minor is the subject of a petition filed under Section 300, 601, or 602. If the probation officer supervising the minor provides information to the court regarding the minor's present circumstances and makes a recommendation to the court regarding a motion to terminate or modify a guardianship established in any county under the Probate Code . . . of the person of a minor who is before the juvenile court under a petition filed under Section 300, 601, or 602, the court shall order the appropriate county department, or the district attorney or county counsel, to file the recommended motion. The motion may also be made by the guardian or the minor's attorney. The hearing on the motion may be held simultaneously with any regularly scheduled hearing held in proceedings to declare the minor a dependent child or ward of the court, or at any subsequent hearing concerning the dependent child or ward." (§ 728, subd. (a).)

As recounted above, the Agency filed the requisite motion to terminate Linda's guardianship pursuant to section 728. The juvenile court granted that

motion, thereby terminating Linda's probate guardianship after finding clear and convincing evidence that it was in the boys' best interest to do so, in accordance with Probate Code section 1601.

Despite the language in section 728 that states that a hearing on a motion to terminate a probate guardianship may be held "at any subsequent hearing concerning the dependent child," Linda contends that because she was provided reunification services, the Agency first was required to file a section 388 petition to terminate those services before seeking to terminate the guardianship under section 728. As Linda points out, as the boys' probate guardian, she was entitled to receive reunification services pursuant to section 361.5, subdivision (a), which provides that "whenever a child is removed from a parent's or guardian's custody, the juvenile court shall order the social worker to provide child welfare services to the child and the child's mother and statutorily presumed father or guardians." (See *In re Merrick V.* (2004) 122 Cal.App.4th 235, 249–250 [19 Cal.Rptr.3d 490] (*Merrick V.*) [explaining that a guardian appointed by the probate court has greater rights than a guardian appointed under the Welf. & Inst. Code, including the right to receive reunification services].) Moreover, since the boys were over three years of age, she was entitled to 12 months of reunification services pursuant to section 361.5, subdivision (a)(1)(A).

■ Linda reasons that once the juvenile court ordered reunification services, they could be terminated prematurely solely pursuant to section 388, subdivision (c). That section provides that a party may petition the court to terminate court-ordered reunification services before the six- or twelve-month review hearings only if one of the following conditions exists: "(A) It appears that a change of circumstance or new evidence exists that satisfies a condition set forth in subdivision (b) or (e) of Section 361.5 justifying termination of court-ordered reunification services. [¶] (B) The action or inaction of the parent or guardian creates a substantial likelihood that reunification will not occur, including, but not limited to, the parent or guardian's failure to visit the child, or the failure of the parent or guardian to participate regularly and make substantive progress in a court-ordered treatment plan." (§ 388, subd. (c)(1)(A) & (B).) In addition, the court shall terminate reunification services only upon a finding by a preponderance of evidence that reasonable services have been offered or provided, and a finding by clear and convincing evidence that one of the above-stated conditions exists. (§ 388, subd. (c)(3).)

The question Linda raises is whether the juvenile court must follow the procedure and make the findings required under section 388, subdivision (c), before it can consider whether to terminate a probate guardianship under section 728. Instructive on this issue is *Merrick V., supra,* 122 Cal.App.4th 235. There, several months after dependency jurisdiction was taken over three

children due to neglect and dispositional hearings held at which their mother was given reunification services, the children's grandmother informed the juvenile court she was their legal guardian through the probate court. (*Id.* at pp. 242–243.) On a motion by the San Diego County Health and Human Services Agency, the juvenile court terminated the grandmother's probate guardianship without providing her reunification services. (*Id.* at pp. 244–245.) On appeal, the grandmother argued the juvenile court was required under section 361.5, subdivision (a) to provide her reunification services since she was the children's guardian when dependency proceedings began, and the juvenile court erred in failing to consider her right to such services before terminating her guardianship. (*Merrick V., supra,* 122 Cal.App.4th at p. 250.)

The appellate court, noting that section 728, subdivision (a) specifically states that the court may hear a motion to terminate a probate guardianship at " 'any regularly scheduled hearing [held in the dependency] proceedings . . . or at any subsequent hearing concerning the dependent child,' " concluded that section 728 "gives the juvenile court the authority to terminate a Probate Code guardianship *at any stage in the dependency proceeding,* including at the detention hearing or the jurisdictional hearing." (*Merrick V., supra,* 122 Cal.App.4th at p. 253, italics added.) Although the appellate court recognized the grandmother's right to reunification services as a probate guardian under section 361.5, subdivision (a), it concluded that right was not irreconcilable with section 728, since "[n]otwithstanding the mandatory language of section 361.5, subdivision (a), a predependency or Probate Code guardianship may legally be terminated before reunification services are offered to the guardian." (*Merrick V., supra,* 122 Cal.App.4th at p. 253.) Finally, the appellate court concluded that because the posture of the case was predispositional with respect to the grandmother, the juvenile court properly could grant the motion to terminate the guardianships under section 728 without first offering her reunification services. (*Merrick V., supra,* 122 Cal.App.4th at p. 253.)

Here, the issue is the interplay between Linda's right as the probate guardian to continue to receive reunification services unless a successful section 388 petition is brought to terminate those services early and the juvenile court's right to terminate the probate guardianship under section 728. As explained in *Merrick V.,* section 728 gives the juvenile court authority to terminate a probate guardianship at any stage in the dependency proceeding. In this case, that stage is after reunification services had been ordered, but before the six-month review hearing. We recognize that the juvenile court's action circumvents section 388, as termination of the guardianship will necessarily result in the termination of Linda's reunification services. The juvenile court, however, was not required to comply with section 388 before

terminating Linda's guardianship, as under section 728 the probate guardianship may be terminated after reunification services are offered to the guardian.

■ Linda's arguments to the contrary are based on a misreading of *Merrick V.*, which she claims holds that "section 728 motions may be used to deny a guardian services only if filed before the dispositional hearing." This, however, is not what *Merrick V.* holds. Instead, *Merrick V.* holds only that reunification services need not be offered to a probate guardian before a section 728 motion may be brought to terminate the guardianship. (*Merrick V., supra*, 122 Cal.App.4th at p. 253.) As we have already stated, the *Merrick V.* court noted that section 728 gives the juvenile court authority to terminate Probate Code guardianships *at any stage* in the dependency proceeding. Section 728 specifically provides that a hearing on a motion to terminate the guardianship may be held "at any subsequent hearing concerning the dependent child." (§ 728, subd. (a).) Thus, there is no time limit, as Linda asserts, on when a section 728 motion to terminate a probate guardianship may be made.

Linda also asserts that because the juvenile court first stated it terminated the guardianship pursuant to section 388, but later corrected itself and stated the termination was pursuant to section 728, the juvenile court was confused about the appropriate legal standard and therefore its order was an abuse of discretion. In support, she cites *In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1061 [81 Cal.Rptr.3d 556], which states that "[a] decision that rests on an error of law constitutes an abuse of discretion." We disagree.

■ The proper vehicle for terminating a probate guardianship in juvenile court is through a motion pursuant to section 728, not a section 388 petition. (*In re Angel S.* (2007) 156 Cal.App.4th 1202, 1208, 1209 [67 Cal.Rptr.3d 792] (*Angel S.*).) While the juvenile court stated at the April 12 hearing that it was terminating the probate guardianship by granting the section 388 petition, it later corrected itself without objection, explaining that it actually had intended to grant the motion to terminate legal guardianship and it found, by clear and convincing evidence, that termination was in the children's best interest. Ultimately, the juvenile court's decision to terminate the guardianship was based on the correct legal standard, namely section 728. Moreover, as Linda points out, the juvenile court could not have terminated the guardianship based on the Agency's section 388 petition, since the Agency did not seek that relief in the section 388 petition. There was no abuse of discretion.

■ Linda contends that pursuant to California Rules of Court, rule 5.620(e), a section 388 petition should be filed before the juvenile court can

entertain a motion to terminate the guardianship under section 728. Rule 5.620(e) states that the juvenile court may terminate or modify a guardianship of a person previously established by the probate court "[a]t any time after the filing of a petition under section 300 and until the petition is dismissed or dependency is terminated." The rule further states, in pertinent part, as follows: "If the social worker recommends to the court, by filing *Juvenile Dependency Petition (Version One)* (form JV-100) and *Request to Change Court Order* (form JV-180), that an existing guardianship be modified or terminated, the court must order the appropriate county agency to file the recommended motion. [¶] (1) The hearing on the motion may be held simultaneously with any regularly scheduled hearing regarding the child. Notice requirements under Probate Code section 1511 apply." (Cal. Rule of Court, rule 5.620(e).) This rule simply states that a social worker can bring the issue of whether an existing guardianship should be modified or terminated to the court's attention by way of a section 388 petition, and if it does so, the court is required to order the appropriate county agency to file the motion to modify or terminate the guardianship. It does not state that a section 388 petition is required before the court can entertain a motion by the appropriate county agency to terminate the guardianship.

■ We turn to Linda's contention that the evidence was insufficient to support the termination of her guardianship. The sole criterion for termination of a probate guardianship is whether termination is in the minor's best interests. (*Angel S., supra*, 156 Cal.App.4th at p. 1208.) We review a juvenile court's order terminating a probate guardianship under the substantial evidence standard. (*Merrick V., supra*, 122 Cal.App.4th at p. 254.) This means, among other things, that we resolve all evidentiary disputes in favor of the court's rulings and draw all reasonable inferences to support them. (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 450–451 [90 Cal.Rptr.3d 44].) Viewing the evidence most favorably to the judgment, as we must do under the substantial evidence standard, the juvenile court's order is amply supported.

Here, the boys had severe emotional and mental problems. Their behaviors were escalating to the point that they were endangering themselves and others. While Linda did what she could to obtain help for the boys, their behaviors worsened and she was unable to control them. Linda was not able to provide a stable home environment, which contributed further to the boys' emotional problems. Although Linda was able to provide the boys with permanency and stability when she first took custody of them and obtained the legal guardianship, as the severity of the boys' problems became more apparent she could no longer provide them with the permanency and stability they required. Linda points to the efforts she made to ensure the boys attended school and received mental health and special education services as evidence that guardianship remained in the boys' best interests. Guardianship was no longer effective for the boys, however, not necessarily due to any lack

of effort on Linda's part, but because their mental health problems were so severe that Linda could not meet their needs.

Linda argues it was not in the boys' best interests to be denied the opportunity to reunify with the only parental figure in their lives. The evidence showed, however, that Xavier was afraid of Linda and did not want to reunify with her, and while D. wanted to reunify, he wanted to do so only if Linda could obtain a stable home for him. Moreover, Linda was unable to control D.'s worsening behaviors.

For all of these reasons, the juvenile court could find, as it did, that it was in the boys' best interests to terminate the guardianship.

## DISPOSITION

The juvenile court's order terminating the probate guardianship is affirmed.

Wiseman, Acting P. J., and Cornell, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 29, 2012, S199702.