Filed 11/10/15  In re Brianna M. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re BRIANNA M., a Person Coming Under the Juvenile Court Law. | |
| MENDOCINO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>R.M.,<br><br>        Defendant and Appellant. | A144497<br><br>(Mendocino County<br>Super. Ct. No. SC-UK-JV-SQ-14-1705301) |

In 2005, paternal grandfather, R.M. (Guardian), was appointed guardian of his two grandchildren, C.M. and Brianna M.[1]  Nine years later, the Mendocino County Health and Human Services Agency (Agency) filed dependency petitions in connection with the grandchildren.  After Guardian's care of the children failed to improve over the course of the dependency proceeding, the Agency petitioned to terminate the guardianship.[2]  As to the younger child, Brianna, the Agency recommended reunification with her mother (Mother), who no longer resided in California.  After giving birth to Brianna at a young age and consenting to the guardianship, Mother had matured and married.  The juvenile

---

[1] Originally, paternal grandmother, H.M., was also appointed guardian of the minors, but after she and R.M. separated in 2009, Mother agreed to R.M. becoming the sole legal guardian of Brianna.

[2] Because C.M. has a different mother, he is not the subject of this appeal.

court terminated the guardianship and granted custody of Brianna to Mother under a plan of reunification. We find no error in these rulings, but we reverse conditionally and remand for compliance with the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.; ICWA).

## I. BACKGROUND

In August 2014, dependency petitions were filed in connection with half siblings C.M., a 14-year-old boy, and Brianna, a nine-year-old girl, who were the wards of Guardian under a probate guardianship. The petitions alleged Guardian failed to supervise and protect the children and failed to provide them with adequate food and shelter.[3] (Welf. & Inst. Code,[4] § 300, subd. (b).) Guardian was alleged to have allowed Brianna to roam a city park without adult supervision, failed to obtain regular medical care for Brianna, and maintained a cluttered, dirty home.

Guardian had assumed care of Brianna when she was less than two months old. Her parents, Guardian's son (Father) and Mother, were incapable of caring for the baby due to substance abuse. Eventually, Guardian obtained an order of probate guardianship for himself and his wife, H.M. The two raised Brianna and C.M., the child of a different mother, in Washington State until sometime in 2010. At that time, Guardian, in the process of divorcing H.M., moved with the children to Mendocino County. In both Washington and California, the family had come to the attention of child protective services due to neglect, the children's behavioral problems, and unsanitary conditions in their home. Guardian and H.M. were generally uncooperative with social services, and Guardian, in particular, expressed resentment of the social workers' intrusions. The problems became more pronounced after Guardian moved to California, and repeated referrals were made to the Agency between 2011 and the filing of the petitions in 2014.

---

[3] Because the guardianship of C.M. is not an issue in this matter, we will not recount the evidence bearing on his circumstances, except as it relates to the status of Brianna.

[4] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

In general, Guardian was not up to the task of caring for his grandchildren, and the resulting neglect had caused them to develop physical, emotional, and behavioral problems. No particular incident led to the filing of the petitions. Rather, as the social worker in charge explained, after "twenty[-]three referrals made, it was decided that this matter would be best served in court."

At the detention hearing, the juvenile court declined to remove the children from Guardian's home, but it imposed a number of conditions on his continued custody, such as ensuring they were attending school and getting proper medical care.

Mother entered the picture when she attended the dispositional hearing in October 2014, and requested placement of Brianna in her home in South Carolina. Mother admitted to the court that at the time of Brianna's birth she was unable to care for the child, but she said she had not entirely lost contact with her. After the move to South Carolina eight years earlier, Mother continued to speak with Brianna periodically by telephone. After Guardian forbade further contact, Mother arranged to speak sporadically with Brianna through the intervention of H.M. Since 2012, Mother and H.M. had regularly discussed methods for Mother to obtain custody of Brianna. Mother had also paid monthly child support and sent birthday and Christmas gifts. In the intervening years, Mother had obtained a GED (general educational development) certificate and attended some college courses. She was married, worked as a cosmetologist, and had two children living with her.

In a subsequent interview, Mother told the Agency that she was 16 years old when she became pregnant with Brianna. When she was hospitalized for treatment of an illness soon after the birth, Guardian and H.M. offered to take care of Brianna during her convalescence. After that, the local child welfare agency offered Mother the choice of a dependency proceeding or guardianship by Guardian and H.M. Thereafter, Mother had only been able to maintain a connection to her daughter through H.M.'s assistance. Once Mother had stabilized her life, she explored ways to regain custody of Brianna, but she lacked the means to pursue them from South Carolina, where she had moved for family

3

support.  Mother submitted to the Agency letters from instructors and coworkers regarding her competence and good character.

In December 2014, the Agency filed a subsequent petition under section 342, based on Guardian's continued failure to provide proper supervision and care.[5]  The Agency alleged Guardian permitted Brianna to stay with Father despite believing she was not safe in his home, failed to ensure she attended school regularly, failed to arrange for necessary counseling services, failed to make arrangements for Brianna to be administered her hyperactivity disorder medications at school, and maintained a dirty, cluttered home that smelled of urine.  Brianna was also alleged to be suffering serious emotional damage, evidenced by bursts of anger, destructive behavior, bedwetting, and a chronic chapped ring around her mouth.

Upon the filing of the section 342 petition, Brianna was detained.  At the jurisdictional hearing, an Agency social worker testified that the Agency's primary concerns were that Brianna had been seen "several times in the community unattended" by an adult and was not receiving needed psychological therapy.  Guardian would not sign forms granting the necessary permission for Brianna to receive therapy outside school, and Brianna's poor school attendance interfered with the therapy provided there. Brianna was supposed to receive hyperactivity medication, but Guardian often failed to administer it.  The juvenile court sustained the allegations of the section 342 petition.

In January 2015, the Agency filed a petition to terminate the guardianship.  The report filed in connection with the petition reiterated the various allegations of neglect by Guardian.  The Agency recommended reunification of Brianna with her parents. According to the Agency's report, Mother had weekly contact with both Brianna and the Agency since the commencement of the dependency proceedings, and she had begun to participate in various services in South Carolina.  She and her husband had already

---

[5] Under section 342, a subsequent petition may be filed in a dependency proceeding alleging new facts and circumstances "other than those under which the original petition was sustained, sufficient to state that the minor is a person described in Section 300 . . . ."

4

completed a parenting class there. Mother stated she had not used drugs in several years, and she was willing to undergo evaluation by a counselor to confirm her sobriety.

At the hearing on the petition to terminate the guardianship, a social worker testified that she had done a criminal background check on Mother and found nothing. Mother had also submitted to a drug test during a visit to California, and it was negative. The social worker said that early visits between Mother and Brianna went well, but Brianna became reluctant to visit with Mother soon after. Given the circumstances, the social worker concluded Guardian had intervened with Brianna to affect her feelings toward Mother. Mother testified that, if Brianna were to live with her, she would provide Brianna a room of her own and ensure that she received necessary therapy.

In its report, the Agency recognized that placement with Mother was an appropriate long term goal for Brianna, but it concluded that therapeutic services and a period of stabilization would be needed to ease her into the transition. When asked at the hearing for its view of immediate custody with Mother, however, the Agency changed its position and assented. Brianna's attorney did not support immediate custody, on the belief that moving Brianna out of the area so soon after removal from Guardian's home would be detrimental to her emotional health.

The juvenile court found that, although Brianna and Guardian had a loving relationship, Guardian "for many years . . . has not fulfilled the role of legal guardian, has not met this child's needs." Accordingly, the court concluded it was in Brianna's best interest to terminate the guardianship. The court found Mother to be "a mother who is capable and willing to take custody of [Brianna] and to meet her needs" and placed Brianna in Mother's custody under a plan of reunification.

## II. DISCUSSION

Guardian challenges the juvenile court's orders, contending the court abused its discretion in concluding termination of the guardianship would be in Brianna's best interest and should have found that placement with Mother would be detrimental to Brianna. In addition, Guardian contends the court failed to comply with ICWA.

5

**A.** *Termination of the Guardianship*

A probate guardianship may be terminated at any time if the court determines termination is in the best interest of the ward. (Prob. Code, § 1601.) When a ward under a probate guardianship becomes subject to a dependency petition, the juvenile court assumes jurisdiction to terminate the guardianship. (§ 728, subds. (a), (f).) In these circumstances, the juvenile court applies the same "best interest" standard for termination of the guardianship. (*A.H. v. Superior Court* (2013) 219 Cal.4th 1379, 1392 (*A.H.*) ["a juvenile court has jurisdiction to terminate a predependency probate guardianship if it is in the best interest of the minor to do so"]; *In re Xavier R.* (2011) 201 Cal.App.4th 1398, 1416.) "What constitutes the best interest of a child presents an inherently factual issue. [Citation.] As this court has recognized, this is 'an inquiry that is particularly founded on application of the trial court's experience with human conduct.' " (*Guardianship of A.L.* (2014) 228 Cal.App.4th 257, 268.) We review a juvenile court's finding that termination of a probate guardianship is in the best interest of the minor for "clear error or abuse of discretion." (*A.H.*, at p. 1392.)

We find no abuse of discretion in the juvenile court's conclusion that it was in Brianna's best interest to terminate the guardianship. Guardian failed properly to supervise Brianna, allowing her to wander in public areas without supervision, and failed to ensure she received the medication and therapy she needed to control her hyperactivity. She was absent from school too frequently, and Guardian maintained a messy, dirty home. Under these conditions, she was developing emotional and behavioral problems. Worse, there was no prospect for improvement. Guardian had maintained similar conditions for years, and he actively resisted the Agency's attempts at assistance, while coaching Brianna to fear the Agency's intervention. Notwithstanding Guardian's good intentions, it is clear the guardianship was no longer serving Brianna's best interest.

Guardian argues Brianna would be emotionally harmed by the separation from him, since she had spent her entire life in his care. While there is no doubt Brianna will suffer loss over the termination of her life with Guardian, she will be better served in the

long run with a competent caretaker. A continuation of the life of neglect she lived with Guardian, which is all that could be expected, would ultimately cause far worse harm than Brianna will suffer in being taken from his home. Further, she need not lose all contact with Guardian, if he is willing to maintain the relationship through telephone contact.

Guardian also argues that Mother has not been a sufficient presence in Brianna's life to justify taking her from Guardian. This is not a situation, however, in which the guardianship has been terminated merely for the purpose of reuniting a child with his or her natural parents. (Compare, e.g., *Guardianship of Kassandra H.* (1998) 64 Cal.App.4th 1228, 1238–1239 [petition by parents to terminate a probate guardianship outside dependency proceedings].) Rather, as discussed above, there were substantial deficiencies in Guardian's care of Brianna that justified termination of the guardianship without regard to Mother's renewed presence in Brianna's life.

## B. *Detriment from Placement with Mother*

Under section 361.2, subdivision (a), a child removed from the custody of a guardian under the dependency laws must be placed with a nonoffending, noncustodial parent, if one is available, unless the juvenile court concludes that the placement "would be detrimental to the safety, protection, or physical or emotional well-being of the child." Section 361.2, subdivision (a) "evinces the legislative preference for placement with the noncustodial parent when safe for the child." (*In re Patrick S.* (2013) 218 Cal.App.4th 1254, 1262.) " 'A parent's right to care, custody and management of a child is a fundamental liberty interest protected by the federal Constitution that will not be disturbed except in extreme cases where a parent acts in a manner incompatible with parenthood.' [Citation.] '[T]o comport with the requirements of the due process clause, a finding of detriment pursuant to section 361.2, subdivision (a) must be made by clear and convincing evidence.' " (*In re Abram L.* (2013) 219 Cal.App.4th 452, 461.)

We cannot say that, as a matter of law, there was clear and convincing evidence of detriment to Brianna. Nothing in Mother's situation suggested a risk of detriment. Mother was part of a two-parent home, already caring for two children. Within the

7

constraints imposed by Guardian, she had attempted to maintain contact with Brianna over the years. When she learned of the dependency proceedings, she quickly became involved, expressed an unequivocal desire to assume care of her child, and attempted to strengthen her bond with Brianna through visitation. She cooperated with the Agency from her home in South Carolina, attending requested training sessions, and was in weekly contact with both Brianna and the Agency. While Mother may have been incapable of caring for her child nearly 10 years ago at age 16, she testified credibly that she had turned her life around relatively soon after giving up custody of Brianna. In the present, there was no reason to doubt that she would be a competent, loving parent.

Guardian's claim of detriment is based largely on Brianna's emotional fragility, her ambivalence toward Mother during the dependency proceeding, and the strength of her attachment to Guardian. Based on these factors, the Agency and Brianna's counsel were reluctant to support granting Mother immediate custody. Importantly, neither the Agency nor Brianna's counsel expressed the view that, over the long term, custody with Mother would be detrimental to Brianna. Both concluded only that a transitional period would aid Brianna in adjusting to the change. Further, Brianna's own attitude toward the placement with Mother was variable. Although she was not entirely accepting of Mother during her foster placement, when the Agency told Brianna she would be going to live with Mother, she "expressed excitement, and stated that she could not wait to see her mother, and baby brothers." Mother was well aware of the difficulty of the transition and had made preparations for therapy when Brianna arrived. Particularly because any detriment to Brianna was uncertain, could be ameliorated with therapy, and was short-term in nature, rather than inherent in her placement with Mother, we cannot say that the evidence of detriment was necessarily clear and convincing, sufficient to overcome the Legislature's stated preference for parental placement.

Guardian also contends the Agency should have traveled to South Carolina to investigate Mother's home and her claims of sobriety. While we agree the Agency could have done more due diligence, Agency social workers were in frequent contact with Mother, including during the time Mother spent in California. Both the Agency and the

court could judge Mother's credibility and character from personal contact with her. A clean criminal record tended to support Mother's claim of sobriety, as did her negative drug test and the letters of support from colleagues. The absence of a home investigation, under these circumstances, did not constitute clear and convincing evidence of detriment.

## C. *ICWA*

As required by ICWA, the Agency inquired into Brianna's Indian ancestry. Guardian reported possible Cherokee ties. On October 16, 2104, the Agency sent Judicial Council form ICWA-030, the statutory notice of Brianna's possible Indian ancestry, to four tribes, but the form omitted some of the information required by the form, notably the names, addresses, birthplaces, and other information about Guardian's parents. According to the notice, H.M. was the source of the information provided, but there was no other indication in the record of the Agency's efforts to obtain the required information. Based on the failure of any tribe to respond, the court found ICWA inapplicable on October 29.

On this record, we agree with Guardian that the Agency failed to provide adequate ICWA notice to the Cherokee tribes.

"Congress enacted ICWA to further the federal policy ' "that, where possible, an Indian child should remain in the Indian community . . . ." ' " (*In re W.B.* (2012) 55 Cal.4th 30, 48.) "When applicable, ICWA imposes three types of requirements: notice, procedural rules, and enforcement. [Citation.] First, if the court knows or has reason to know that an ' "Indian child" ' is involved in a ' "child custody proceeding," ' . . . the social services agency must send notice to the child's parent, Indian custodian, and tribe by registered mail, with return receipt requested. [Citation.] . . . [¶] Next, after notice has been given, the child's tribe has 'a right to intervene at any point in the proceeding.' [Citation.] . . . [¶] Finally, an enforcement provision offers recourse if an Indian child has been removed from parental custody in violation of ICWA." (*Id.* at pp. 48–49.) "Thorough compliance with ICWA is required." (*In re J.M.* (2012) 206 Cal.App.4th 375, 381.)

Of concern here is the notice requirement. If an Agency "knows or has reason to know that an Indian child is involved" in a dependency proceeding, the Agency must send notice of the proceeding to, among others, a representative of all potentially interested Indian tribes. (§ 224.2, subd. (a).) "[F]ederal and state law require that the notice sent to the potentially concerned tribes include 'available information about the maternal and paternal grandparents and great-grandparents, including maiden, married and former names or aliases; birthdates; place of birth and death; current and former addresses; tribal enrollment numbers; and other identifying data.' [Citations.] To fulfill its responsibility, the Agency has an affirmative and continuing duty to inquire about, and if possible obtain, this information. [Citations.] Thus, a social worker who knows or has reason to know the child is Indian 'is required to make further inquiry regarding the possible Indian status of the child, and to do so as soon as practicable, by interviewing the parents, Indian custodian, and extended family members to gather the information required in paragraph (5) of subdivision (a) of Section 224.2 . . . .' [Citation.] That information '*shall* include' '[a]ll names known of the Indian child's biological parents, grandparents, and great-grandparents, or Indian custodians, including maiden, married and former names or aliases, as well as their current and former addresses, birthdates, places of birth and death, tribal enrollment numbers, and any other identifying information, if known.' [Citation.] Because of their critical importance, ICWA's notice requirements are strictly construed." (*In re A.G.* (2012) 204 Cal.App.4th 1390, 1396–1397 (*A.G.*).)

In *A.G.*, the child welfare agency omitted much of the same information from the notice form as omitted by the Agency here, without any explanation in the record for the omissions or description of the efforts made to secure the necessary information. (*A.G.*, *supra*, 204 Cal.App.4th at pp. 1394, 1397.) The court concluded "[e]rror is obvious" and issued a limited remand for ICWA compliance. (*Id.* at pp. 1397, 1402.) While the omissions here were not as comprehensive as those in *A.G.*, the difference is legally immaterial. Further, there is no explanation for the Agency's omissions in the record and no reason to presume the omitted information was unavailable to the Agency. Because of

the Agency's unexplained failure to comply with the notice requirements of ICWA, we must reverse the juvenile court's order and remand to ensure ICWA compliance. (See *In re Francisco W.* (2006) 139 Cal.App.4th 695, 705–706, 708 [explaining purpose of limited reversal].)[6]

The Agency contends any omissions in the notice were harmless. " 'Deficiencies in an ICWA notice are generally prejudicial, but may be deemed harmless under some circumstances.' " (*In re S.E.* (2013) 217 Cal.App.4th 610, 615.) We have no basis for finding these omissions harmless. There is nothing in the record to suggest the omitted information, potentially critical in tracing Father's Indian ancestry, would not have resulted in a different response from the tribes.

On remand, the Agency must either obtain the omitted information and provide new notice to the tribes or demonstrate to the juvenile court that it engaged in the efforts required by section 224.3, subdivision (c) and California Rules of Court, rule 5.481(a)(4) and was unable to acquire the additional information about Father's family members.

### III.  DISPOSITION

The juvenile court's orders of February 18, 2015 and February 26, 2015, terminating Brianna's guardianship and granting custody of Brianna to Mother under a plan of reunification, are reversed, and the court's finding that ICWA is not applicable to this proceeding is vacated. The case is remanded to the juvenile court with directions to ensure the Agency has complied with the notice requirements of ICWA. If, after new notice, any of the tribes claim Brianna is eligible for membership and seeks to intervene, the juvenile court shall proceed in conformity with all provisions of ICWA. If,

---

[6] Guardian also contends the juvenile court failed to allow the statutory time period for a response from the tribes before finding ICWA inapplicable. Section 224.3, subdivision (e) states that a court cannot find ICWA inapplicable to a proceeding unless the tribal recipients of the notice have responded negatively or, if no response is received, 60 days have passed since the mailing of notice. (§ 224.3, subd. (e)(1)–(3).) While we agree the court was premature in finding ICWA inapplicable, a report filed in December 2014 stated the Agency had received only one response, and that response was negative. Accordingly, the juvenile court's error in prematurely declaring ICWA inapplicable was harmless.

11

on the other hand, the tribes make no such claim following new notice or the court concludes the Agency's efforts at compliance were adequate and no further information about Father's family is reasonably available, the inapplicability finding and the February 18 and 26 orders shall be reinstated.  Assuming Brianna is still in the custody of Mother, that custody may be maintained pending Agency compliance with ICWA.


_____
Margulies, J.


We concur:


_____
Humes, P.J.


_____
Dondero, J.