Filed 4/16/13  In re E.A. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re E.A., a Person Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> P.A., <br><br> Defendant and Appellant. | Consolidated Case Nos. F065053 & F065413 <br><br> (Super. Ct. No. JD127579-00 ) <br><br> **OPINION** |

APPEAL from a judgment of the Superior Court of Kern County. Louie L. Vega, Judge.

Marin Williamson, under appointment by the Court of Appeal, for Defendant and Appellant.

Theresa A. Goldner, County Counsel, Jennifer E. Feige, Deputy County Counsel for Plaintiff and Respondent.

-ooOoo-

P.A. (mother) appeals from a juvenile court order granting custody of her daughter E.A. to the girl's biological father and dismissing the juvenile dependency proceeding.

Mother contends that the court had no authority to grant custody to E.A.'s biological father because only presumed fathers may be granted custody pursuant to Welfare and Institutions Code section 361.2.[1]

We reluctantly agree and reverse the court's order. We share the court's concern about mother's ability to benefit from reunification services, but the court was not authorized to dismiss the petition and grant custody to a biological father who is not a presumed father.

### *FACTUAL AND PROCEDURAL HISTORIES*

Mother has two daughters, E.A., who was born in 2005, and E.N., who was born in 2009. B.S. is the biological father of E.A. J.N. is the presumed father of E.N. This appeal involves E.A. only.

On September 30, 2011, the Kern County Department of Human Services (Department) filed juvenile dependency petitions regarding E.A. and E.N alleging failure to protect. (§ 300, subd. (b).) The Department alleged that mother was unable to provide regular care due to her failure to protect the children from ongoing domestic violence. Mother had been arrested for throwing items around the home of J.N. and his live-in girlfriend. Mother hit J.N. in the chest, and his girlfriend pushed mother while she was holding E.N. The children were present during this incident and several other incidents of domestic violence between mother, J.N., and J.N.'s girlfriend. As to E.N., the Department alleged that J.N. also failed to protect his child from ongoing domestic violence. In addition, he left E.N. and E.A. in the care of his girlfriend, who suffered from mental illness and substance abuse and said that voices in her head told her to stab everyone. E.A. and E.N. were placed in protective custody.

---

[1]Subsequent statutory references are to the Welfare and Institutions Code unless otherwise noted.

2.

In a social study prepared for the detention hearing, the Department reported that mother told a social worker that E.A.'s father, B.S., was deceased. She stated that she did not know any other identifying information for him. Mother reported that B.S. was an athlete and he died from overdosing on steroids.

Mother also provided the social worker with a family court document that appeared to give her temporary custody of E.N. and ordered J.N.'s girlfriend not to have contact with the child. It was dated January 14, 2011, but mother admitted that she had lived with J.N. and his girlfriend in January 2011 for a short time, in May and June 2011, and then again on September 22, 2011. At other times, she stayed with a friend or at a motel or homeless shelter. Mother was kicked out of a homeless shelter for not following the rules. She told the social worker that she had been trying to stop having a relationship with J.N. for two years but she had no option and she was powerless. Mother was pregnant and did not want to disclose who the father was.

On October 3, 2011, the juvenile court found a prima facie showing that E.A. and E.N. came within section 300 and ordered the children detained. Following mediation, mother and J.N. submitted on the allegations in the petitions. In a social study prepared for the jurisdictional hearing, the Department noted that E.A.'s biological father B.S. was deceased. At the jurisdictional hearing on November 22, 2011, the juvenile court found the allegations of the petitions true.

At the dispositional hearing on January 25, 2012, the court found that the Department had provided reasonable reunification services, but mother had made minimal progress toward alleviating or mitigating the causes for the children's placement in out-of-home care. Mother was ordered to participate in counseling for domestic violence as a perpetrator, parenting, and mental health. Mother was allowed weekly two-hour visits with the children.

On March 5, 2012, mother filed a petition to change the court's order pursuant to section 388, in which she sought the return of E.A. and E.N. The petition included the

information that E.A.'s father was deceased. On April 9, 2012, the court denied the section 388 petition. On May 2, 2012, mother filed another section 388 petition seeking return of EA. and E.N.

Meanwhile, E.A.'s biological father, B.S., who is alive and lives in Texas, learned about this case. A court-appointed special advocate (CASA) for E.A. and E.N. spoke to B.S. by telephone on April 2, 2012. B.S. indicated that a relationship with his daughter would be nice and seemed willing to consider placement of E.A. if the only other option were long-term foster care. On May 30, 2012, B.S. requested an ex parte hearing to establish paternity and request visitation. He submitted lab results from 2005 showing a 99.99 percent probability that he was the biological father of E.A.

At an ex parte hearing on June 1, 2012, counsel for B.S., Michelle Trujillo, informed the court that B.S. was going to be in California later that month and he wanted to have visits with E.A. Trujillo stated that B.S. would be asking for placement and/or reunification services. Mother's counsel did not dispute that B.S. was E.A.'s biological father, but stated that B.S. had not had any contact with E.A., and "[h]e has spurned all requests or all attempts by [mother] to have him involved in … the child's life." Trujillo told the court that B.S. was "interested in establishing a relationship with [E.A.]." She asked the court to recognize B.S. as E.A.'s biological father and suggested that he should be considered her presumed father. The court stated, "I don't think we have any issue with biological. I think we still have issues as to presumed at this point." The court declared B.S. to be E.A.'s biological father.

On June 4, 2012, the court held a hearing on mother's section 388 petition and B.S.'s request for visitation. Counsel for the children told the court that E.A. was eager to meet her biological father:

> "[E.A.] was told about her father approximately two weeks ago or so by the
> social worker. And she is extremely anxious to meet him. She wants to
> visit him as much as she possibly can. She has gone through several mental
> exercises to imagine what he looks like and whether he's tall or short, has

4.

hair or is bald. And she's quite excited about seeing him. And she asked me to ask this court to give her as much visitation as possible with her father."

The Department recommended that B.S. be allowed supervised visitation, three times a week. The court granted B.S. supervised visitation with E.A. to occur three times per week for two hours per visit. The court ordered the Department to facilitate reasonable telephone contact between B.S. and E.A. and further authorized the initiation of a request for services in Texas through the Interstate Compact for the Placement of Children (ICPC). The court also denied mother's section 388 petition.[2]

On July 17, 2012, B.S. filed a section 388 petition. He sought (1) placement of E.A. with him and dismissal of the juvenile dependency petition, or, alternatively, (2) placement of E.A. with him with family maintenance services, or (3) reunification services. He alleged that the changed circumstances warranting a change in the court's orders were: B.S. traveled to Kern County specifically to reunite with E.A.; their visits and additional phone calls were positive; and it was believed he had been approved for placement by social services in Texas. In response to the form question asking why the changes requested would be better for the child, B.S. wrote: "The father is willing and able to provide a safe and stable home for his child. The father strongly desires to be reunited with his child, and reunification with a parent is always the first, best option in dependency matters."

The CASA filed a report and recommendations for the status review hearing scheduled for July 2012. She recommended continuing reunification services for mother, although she noted that mother "has not demonstrated measurable progress" and "has not assimilated the concepts of safe parenting presented in her courses .…" The CASA

---

[2]Mother filed a notice of appeal from the court's order of June 4, 2012. On the appeal form, she wrote that she was appealing "Placement and visitation with Father in Texas." The court's order of June 4, 2012, however, did not place E.A. with B.S., nor was visitation in Texas authorized.

"observed very little change in the way that [mother] faces not only her parenting issues but her life situations as well." The CASA was also able to observe a visit between B.S. and E.A., which she described as "positive."

In a social study submitted to the court on July 16, 2012, the Department recommended that reunification services for mother be continued. The Department reported, however, that mother had made minimal progress toward alleviating the causes for her children's removal, and she had not made acceptable efforts and had not availed herself of services provided to facilitate a return of her children.

A social worker described a visit between mother and E.A. and E.N. that occurred on June 5, 2012. Mother told E.A. that she (mother) was working on her class and she was going to get everyone back together. E.A. told her mother, "No," and explained that E.N. was not going back to mother; she was going to stay with her father, J.N. The court had already placed E.N. with J.N. who was receiving family maintenance services. Mother changed the subject and told E.A., "You're going to go live with your father [B.S.], remember him." E.A. became excited and said, "oh yes, my dad." Mother told E.A., "When you go and live with your dad, mommy is not going to go and live with you." E.A. smiled and said, "okay." This conversation occurred before E.A. met B.S. In a visit between mother and her daughters after E.A. met her biological father, mother asked E.A. about him, and E.A. responded, "Don't worry he's going back to Texas today and he gave me his phone number so that I can call them." Mother asked what she thought of B.S., and E.A. said, "I like him." It was also noted that mother smacked E.N. on the mouth during another supervised visit, and the Department posed the question, "If the mother does this when she knows she is being watched, what will she do when she is not being watched?"

A social worker described the first visit between B.S. and E.A, which occurred on June 20, 2012. The CASA introduced E.A. to B.S. and they hugged and B.S. had tears running down his face. E.A. gave B.S. a paper heart chain she made and he attached it to

6.

his shirt. He gave her presents—clothes, sandals, hair accessories, a journal, a coloring/sticker book, and a Rapunzel Barbie. B.S. brought photos of himself when he was around E.A.'s age, and E.A. said they looked just like each other and smiled. E.A. talked and smiled throughout the whole three-hour visit. E.A. had a camera and took pictures. B.S.'s wife was present and took pictures of the two of them. B.S. and E.A. played a game of Sorry and colored and put stickers in E.A.'s new activity book. At the end of the visit, B.S. told the social worker it was hard telling E.A. goodbye. The social worker arranged for them to have a supervised visit for dinner that evening.

The social study also reported that E.A. had been attending mental health counseling since May 2012, and her therapist diagnosed her with adjustment disorder with mixed anxiety. E.A. made suicidal threats and was receiving therapeutic behavioral services. Her therapist reported that the caregivers had been consistent with sessions and appeared to follow through with the treatment plan, and E.A. was demonstrating progress in her treatment goals.

The Department submitted a supplemental social study on July 20, 2012, and changed its recommendation. The supplemental social study provided:

> "As to the child [E.A.], the biological father, [B.S.] contacted the Department requesting placement of his child … once he became aware that his child, [E.A.] was in protective custody. The biological father, [B.S.] visited his child … and has telephone contact with the child …. The father is requesting placement of his child, [E.A.]. The father's home has been evaluated and housing is appropriate. [¶] The Department will be recommending the child … be placed with her father, [B.S.] and jurisdiction be terminated."

The social study included a letter from the Texas Department of Family and Protective Services dated July 18, 2012. A social worker had visited B.S.'s home and reported as follows:

> "On July 13, 2012, Worker arrived to the apartment of [B.S.] which is a nice gated complex; he and his wife … live in a one bedroom apartment. They are waiting for a 2 bedroom apartment to become available by the end

7.

of July, 2012. Worker went through the home and it was clean with all utilities in working order. Worker was informed that the lay out of the 2 bedroom is the same only with another bedroom and bathroom added on. The apartment is located on the top floor and their balcony overlooks the pool area. There is a small sitting place on the balcony. It is apparent the couple is smokers and informed worker they do not smoke in the home. There were no safety risks in the home. Background checks on both [B.S. and his wife] completed and cleared. If you have any question, please don't hesitate to call."

The Department submitted a second supplemental social study on July 27, 2012, in which a social worker documented a supervised visit that occurred on July 25, 2012. E.N. is lactose intolerant, and the social worker observed that mother was giving her cheese slices. Mother said that the cheese was only made with soy milk and oil. The social worker asked if she could read the label for documentation that the cheese did not contain any milk products. She read the label, which showed the product contained milk, cheese cultures, and cream cheese. The social worker showed it to mother, who said, "It doesn't fucking matter because [E.N.] isn't allergic or lactose intolerant" and "What do you know you are only a stupid HSA." Mother then called her own mother and complained about the incident, stating "What does it fucking matter, she is only an HSA and doesn't know what she's talking about" and "This is so fucking stupid, whatever." The second supplemental social study recommended that E.A. be placed with B.S. and jurisdiction be terminated.

On July 30, 2012, the juvenile court held a combined hearing on B.S.'s section 388 petition and a status review for E.A. and E.N. E.A. and E.N. were not present at the hearing. Mother objected to placement of E.A. with B.S. and testified in opposition to the section 388 petition.

Mother testified that when she became pregnant with E.A., B.S. gave her $200 and told her to get rid of it. E.A. was born in Fort Worth, Texas. Mother tried to contact B.S. after E.A. was born, but he never went to see his child. Mother brought an action in Texas for child support and custody that resulted in mother getting custody of E.A. She

8.

showed E.A. to B.S. at the courthouse in Fort Worth. Mother also went to the house of B.S.'s father to present E.A. to B.S. before she moved to California. She set up an e-mail account with B.S., and she still had the account. Since she left Texas, mother has not had any contact with B.S.

Mother also testified that, after she left Texas for California, she received a petition for paternity and she drove back to Texas in November 2005 and lived in Texas for a year. Mother testified that she never tried to hide E.A. from B.S., and she tried to contact B.S.'s sister several times. She admitted that B.S. paid child support off and on. Mother explained that she believed B.S. was dead because she "was told by child support" that "he had not had any hits on his Social Security in three years, and more than likely was deceased." Nonetheless, mother called B.S.'s father's house once or twice a year over the years. She also tried calling him and e-mailing his sister when the dependency case began. Mother also testified that E.A., who was seven years old, and E.N., who was three years old, had a close relationship.

B.S. testified that he learned he was E.A.'s father after a paternity test was done. He was ordered to pay child support in November 2005. He paid child support periodically when he had a job, and when he received unemployment, payment was withdrawn from his account automatically. He was current on payments as he paid back child support when he was employed again. B.S. testified that no one in his family ever told him that mother tried to contact him. He was not aware of the e-mail address mother testified about. B.S. testified that he was prepared to take E.A. home with him. He told the court that their visits went very well, he loved his daughter, and he "can't wait to be in her life." B.S. and his wife are employed and there are no other children in their home.

B.S. testified that he made inquiries about E.A., but he was assuming that she had his last name. It appeared, however, that a court document regarding child support listed E.'s last name as A., mother's last name. B.S. did not ask the agency that was collecting child support about E.A.'s whereabouts because it was his understanding that they would

not be able to give him information about mother. B.S. planned to have E.A. visit with her sister E.N. twice a year and they would have unlimited phone calls and e-mail.

The court then heard argument on B.S.'s section 388 petition. The CASA stated that she agreed with the Department's recommendation to grant B.S. custody of E.A.

Mother's counsel James Sorena reminded the court that this was also a status review hearing for mother, and there was a plan of family reunification services. Sorena asserted that mother had completed each and every step of her case plan. "She's done everything within the particular measurable time frame delineated to merit, according to the contract [referring to court orders and the case plan], return of her children pursuant to the family reunification plan." He argued that certain people in the Department were biased against mother and that was reflected in the negative social studies. Finally, Sorena argued:

> "What we are contemplating at this time is taking this child from her mother and her sister, placing her with a man that she does not know and has not known, who has not made any effort to find his daughter. I mean, I don't know how often we see that characterization as a basis for denying someone reunification services, that he's merely [a] biological father. He's made no efforts to maintain a relationship. He's a stranger to this child. We hear that all the time.

> "At this point that's what we have for [B.S.] I'm not saying he's necessarily a bad guy or anything like that. But he—over seven years, he has not sought to contact this child. And to take this child at this time and place her with this stranger, in a strange place, with a completely strange family, with her having these mental health issues that have been described in the reports, suicidal expressions, various other personality issues, place her in an unknown world with unknown people at a time when her mother is—has completed reunification I think is completely inappropriate. These children should be returned to their mother. And if … the court believes that perhaps there is some additional counseling to fine tune or burnish the courses that the mother has completed, then that may be appropriate. But to take this child and to tear her from her mother and her sister is—cannot be found to be in this child's best interest and is a violation of the compact made at the time of the disposition."

10.

Trujillo responded that B.S. was no longer a stranger to E.A. because they had had several visits of "exceptional quality." She also pointed out that B.S. had made efforts to find mother and E.A. Trujillo argued the section 388 petition should be granted because "we have met our burden .…"

Counsel for the children, Rory McKnight, observed, "I don't think that anybody that's involved in this case as a party adult has done everything that they could possibly do to resolve all the issues." He continued, "[W]e come down to what insofar as the 388 is concerned, what is the best interest of the child, and insofar as the [366.21, subdivision (e) review] is concerned, whether or not there's a substantial risk or an on-going substantial risk to the child if placed with the mother." Counsel argued that mother's behavior at recent supervised visits, "even after all of the counseling that the mother has completed," showed that she had not "assimilated the information sufficiently to deal with stressful situations." He argued that the most recent visit—in which mother lied about the cheese she offered E.N. and cursed and insulted the social worker—demonstrated that mother was not able to accept input from anyone (such as social workers and counselors) regarding her children's well-being. Considering whether out-of-home placement should continue, McKnight said, "[W]e are not at a place in the reunification plan where the children can safely … return to the mother based upon her own actions objectively observed and documented."

Regarding the section 388 petition, McKnight told the court, "[W]hen we're measuring the best interests of the child at this point, they certainly weigh heavily in favor of the 388 being granted."

The court granted the section 388 petition, explaining:

"The issue here is the best interests of this child.… The circumstances of the absence of her father I think have been properly documented.… I think obviously there was some alienation and some disappointments between the parents of this child, and that may have factored into the disclosure issue regarding the father [i.e., mother saying he was dead], and that was obviously resolved now.

11.

"I am concerned regarding … the counseling and the training that the mother has gone through as far as her being able to benefit from what she's been presented with. Based on the more recent reports, it still is an issue for her that she will have to continue to work through.

"Based on all the evidence that's been presented in these initial and supplemental reports, the court is going to follow the recommendations that the petition for the child being placed with the father is well taken and … the 388 petition is, therefore, granted."

The minute order for the hearing provided that the noncustodial parent's request for placement was granted. B.S. was awarded sole legal and physical custody of E.A. and jurisdiction was terminated.[3] The court granted mother monthly visits of eight hours, plus two visits per year of no less than three days. Mother was allowed reasonable telephone contact of up to two calls per week.

Mother filed a notice of appeal on August 2, 2012.

### *DISCUSSION*

On appeal, mother contends that the juvenile court had no authority to grant custody of E.A. to her biological father or to prematurely terminate mother's reunification services because only presumed fathers may be granted custody. She argues that only section 361.2, subdivision (a), grants the juvenile court authority to place a dependent minor with the noncustodial parent, but that statute applies only to *presumed* parents; "a *biological* father is not entitled to custody under section 361.2 …." (*In re Zacharia D.* (1993) 6 Cal.4th 435, 454, italics added.)

As a preliminary matter, the Department argues that mother has waived (or forfeited[4]) this contention because she did not raise the issue with the juvenile court.

_____

[3]The dependency case for E.N. continued, with mother receiving continued reunification services. She was also ordered to participate in counseling for anger management, domestic violence as a perpetrator, family matters, guided visitation, and mental health.

[4]"Although the loss of the right to challenge a ruling on appeal because of the failure to object in the trial court is often referred to as a 'waiver,' the correct legal term

12.

Generally, an appellant forfeits an issue if she failed to object on that ground below. (See, e.g., *In re Sabrina H.* (2007) 149 Cal.App.4th 1403, 1419.) In this case, mother objected to placing E.A. with B.S., and Sorena argued that B.S. was only a biological father and a stranger to E.A. Sorena told the court that it would be inappropriate to place E.A. with B.S. and not in the child's best interest, but he did not argue that the court lacked authority to grant B.S. custody.

Mother responds that, in this case, the juvenile court acted in excess of jurisdiction[5] in that the court's order violated the comprehensive statutory scheme governing juvenile dependency. For this reason, she urges this court to consider her contention.

Mother relies on *In re Andres G.* (1998) 64 Cal.App.4th 476, 480, in which the parties all consented to the juvenile court's order that removed the children from the custody of the parents but then detained them in their parents' home. The parties and the appellate court agreed that the court's order was not authorized under section 361, which governs removal of minors from their parents or guardians. (*In re Andres G., supra,* at pp. 480-481.) The Department of Social Services argued, however, that the father-appellant forfeited the issue on appeal by failing to object. The appellate court rejected

---

for the loss of a right based on failure to timely assert it is 'forfeiture,' because a person who fails to preserve a claim forfeits that claim. In contrast, a waiver is the '"intentional relinquishment or abandonment of a known right."'" (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. 2.)

[5]In the strict or fundamental sense, "lack of jurisdiction" refers to a court lacking authority over the subject matter or the parties, but in a broader sense, lack of jurisdiction may also refer to circumstances in which "a court grants 'relief which [it] has no power to grant.' [Citations.]" (*Carlson v. Eassa* (1997) 54 Cal.App.4th 684, 691.) "Where, for instance, the court has no power to act 'except in a particular manner, or to give certain kinds of relief, or to act without the occurrence of certain procedural prerequisites,' the court acts without jurisdiction in this broader sense." (*Ibid.*) Here, mother contends that the juvenile court lacked jurisdiction in the broader sense.

the forfeiture argument. The court first explained the possible consequences of the court acting in excess of jurisdiction in the broad sense:

> "'[A]n act in excess of jurisdiction is valid until set aside, and parties may be precluded from setting it aside by such things as waiver, estoppel, or the passage of time. [Citations.]' [Citation.] [¶] Whether a party who has sought or agreed to an action in excess of a court's jurisdiction is estopped to complain depends on the importance of the irregularity and considerations of public policy. [Citations.] [¶] Reviewing courts have repeatedly allowed acts in excess of jurisdiction to stand when the acts were beneficial to all parties and did not violate public policy [citation], or when allowing objection would countenance a trifling with the courts. [Citation.] [¶] On the other hand, courts have voided acts in excess of jurisdiction when the irregularity was too great, when the act violated a comprehensive statutory scheme or offended public policy. [Citations.]" (*In re Andres G.*, *supra,* 64 Cal.App.4th at pp. 482-483.)

The court then concluded that the juvenile court's order was reviewable on appeal:

> "The trial court's act of finding it necessary to remove physical custody from the parents, place custody with Department and then immediately return the children to the parental home was an act not authorized by the Welfare and Institutions Code and was in excess of the trial court's jurisdiction. [Citation.] That act, which Department and juvenile court routinely employ, whether consented to, sought by, or happily accepted by the parties and the juvenile court, systematically contravenes a comprehensive statutory scheme operating in an area of special social interest and has the effect of reconfiguring the responsibilities of the court and Department in a manner not contemplated by the Legislature. While we accept the good faith of all involved, such a routine and fundamental readjustment of a law with such important social implications cannot be undertaken simply because the parties believe it expedient or even useful to the overall goal of the legislative scheme. We suggest Department and interested parties take up this matter with the Legislature." (*In re Andres G.*, *supra*, 64 Cal.App.4th at p. 483.)

In our case, the juvenile court's order granting B.S. custody and dismissing the dependency petition was not part of a systematic procedure contravening a statute. Nonetheless, since mother contends the court violated the comprehensive statutory scheme governing dependency proceedings, we decline to apply the forfeiture rule in this appeal. (See also *In re S.B.*, *supra*, 32 Cal.4th at p. 1293 ["[A]pplication of the forfeiture

14.

rule is not automatic"]; *In re Xavier R.* (2011) 201 Cal.App.4th 1398, 1412 ["[B]ecause the facts … are not disputed and the issue raises only a question of law, the general rule [of forfeiture] does not apply"].)

Accordingly, we turn to the merits of mother's appeal. Section 361.2, subdivision (a), provides:

> "When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child."

B.S., however, did not qualify for custody of E.A. under section 361.2, subdivision (a). In dependency proceedings, fathers are divided into four categories: de facto fathers, alleged fathers, biological fathers (also referred to as natural fathers), and presumed fathers. (*In re Jerry P.* (2002) 95 Cal.App.4th 793, 801.) "A man who has held the child out as his own and received the child into his home is a 'presumed father.'" (*Ibid*.; Fam. Code, § 7611, subd. (d).) "Presumed father status ranks highest. Only a 'statutorily presumed father' is entitled to reunification services under Welfare and Institutions Code section 361.5, subdivision (a) and custody of his child under Welfare and Institutions Code section 361.2." (*In re Jerry P.*, *supra*, at p. 801, citing *In re Zacharia D.*, *supra*, 6 Cal.4th at p. 451.)

Here, the juvenile court found B.S. to be E.A.'s biological father on June 1, 2012, but it never explicitly elevated him to the status of presumed father. As a consequence, he was not entitled to custody under section 361.2. The Department concedes this point.

The Department does not offer any authority for the proposition that a juvenile court can remove a child from her mother and, during the mother's reunification period, give custody of the child to a noncustodial biological father and dismiss the juvenile

15.

dependency petition against the mother. The Department attempts to justify the court's order with two assertions. First, "it is clear that the juvenile court has the discretion to order family reunification services if those services are in the minor's best interest, which result in custody being granted if those services are successful." Second, a biological father "may move under section 388 for a hearing to reconsider the juvenile court's earlier rulings based on new evidence or changed circumstances to seek custody," which is what B.S. did "because Appellant alleged he was deceased." These assertions do not provide statutory authority for the court's order.

As to the first point, although it is correct that "the juvenile court may order services for the child and the biological father, if the court determines that the services will benefit the child" (§ 361.5, subd. (a)), this does not help B.S. because he did not receive reunification services. Rather, it was mother who was entitled to reunification services (*ibid.*), and it was she who would expect to have her children returned to her if reunification services were successful. (See *In re Marilyn H.* (1993) 5 Cal.4th 295, 308 ["At the dispositional hearing, and at each review hearing prior to permanency planning, there is a statutory presumption that the child will be returned to parental custody"].)

As to the second point, section 388, subdivision (a)(1), provides that a parent or other interested person may, "upon grounds of change of circumstance or new evidence," petition the juvenile court for a hearing to change, modify, or set aside any previous order of the court. Certainly, it was new information that B.S. was alive, contrary to the information provided by mother that he had died of an overdose. This fact, however, did not elevate him to the status of presumed father.

The Department cites *In re Zacharia D.*, *supra*, 6 Cal.4th at page 454, in which the California Supreme Court observed, "While a biological father is not entitled to custody under section 361.2, or reunification services under section 361.5 if he does not attain presumed father status prior to the termination of any reunification period, he may move under section 388 for a hearing to reconsider the juvenile court's earlier rulings based on

16.

new evidence or changed circumstances." (Fn. omitted.) This means a biological father can file a section 388 petition to ask for presumed-father status based on new evidence or changed circumstances (e.g., *In re Vincent M.* (2008) 161 Cal.App.4th 943, 948-949), but that did not happen in the present case. B.S.'s section 388 petition did not ask for presumed-father status. Further, since the issue was not discussed during the hearing, we cannot say the juvenile court implicitly found B.S. to be E.A.'s presumed father.

The Department concludes, "Given the choice between subjecting E.A. to an additional period of reunification services with someone who had demonstrated little progress thus far or dismissal of her dependency action and placement with a stable parent who could adequately provide for her, it is clear the juvenile court did not abuse its discretion in granting custody to E.A.'s biological father and dismissing her case." We are sympathetic to the Department's concern, but we cannot ignore the fact, at this point in the proceeding, that the child's need for stability is not the only, or even the paramount, consideration. "'[U]p until the time the section 366.26 [permanency planning] hearing is set, the parent's interest in reunification is given precedence over a child's need for stability and permanency.' [Citation.]" (*In re Zacharia D.*, *supra*, 6 Cal.4th at p. 447.)

For these reasons, we reverse the court's order granting custody of E.A. to B.S. and dismissing the juvenile dependency petition. On remand, B.S. is free to ask the court to elevate him to presumed-father status. In addition, we observe that B.S. sought, in the alternative, placement of E.A. with him and family maintenance services or reunification services and he would be able to do so again.

## *DISPOSITION*

The juvenile court order is reversed and the juvenile court is directed to reconsider B.S.'s section 388 petition in accordance with this opinion.

_____
Wiseman, Acting P.J.

WE CONCUR:

_____
Detjen, J.

_____
Peña, J.