Filed 2/16/23  In re M.H. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re M.H., et al., Persons Coming Under the Juvenile Court Law. | |
| KINGS COUNTY HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> M.W., <br><br> Defendant and Appellant. | F084490 <br><br> (Super. Ct. Nos. 22JD0008, 22JD0009) <br><br> **OPINION** |

-ooOoo-

APPEAL from the orders of the Superior Court of Kings County.  Jennifer Lee Giuliani, Judge.

Seth F. Gorman, under appointment by the Court of Appeal, for Defendant and Appellant.

Diane Freeman, County Counsel, Risé A. Donlon and Thomas Y. Lin, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Appellant M.W. (grandmother) is the paternal grandmother and former guardian of nine-year-old M.H. and eight-year-old Jackson H. (collectively "the children"), who are the subjects of a dependency case. Grandmother challenges the juvenile court's orders terminating the grandmother's probate guardianship over the children and placing the children in their father's custody under a plan of family maintenance. She argues that the juvenile court's orders terminating the probate guardianship and removing the children from her care were not supported by substantial evidence. The grandmother further argues that the juvenile court failed to consider the proper legal standard for removing the children from the grandmother's custody prior to terminating the guardianship. We reject these claims and affirm the juvenile court's orders.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Initial Removal

On January 22, 2022, law enforcement responded to the grandmother's home after Jackson dialed 911 to report that grandmother was being verbally abusive toward M.H. Jackson told the 911 operator that grandmother was calling M.H. a "freak" and "liar," and he hung up the phone because he was afraid grandmother was going to "whoop" him for calling 911. Grandmother refused to allow law enforcement officers into the home and slammed the door on the officers' faces multiple times. She would not provide a statement to the officers, but she allowed the children to be interviewed outside of the home. M.H. told the officers that grandmother did not hear Jackson say "okay" after she told him to stop watching television. Grandmother caused Jackson's head to move forward after she slapped him on the back of the head. The children claimed grandmother called them names, and they wanted to be placed into a foster home. Law enforcement had no prior history with grandmother involving the children.

The next day, a social worker with the Kings County Human Services Agency (agency) responded to the home with the law enforcement officers. Grandmother declined to speak with the social worker after it was explained that there were concerns

2.

with how grandmother was disciplining the children. The social worker was able to interview each of the children outside of the home with grandmother's permission.

M.H. reported feeling "fine" and "safe," but he would "get whoopings" for not following house rules. M.H. claimed grandmother hit the children with a belt on their shoulders, back, butt, and legs, and the belt had left black marks on him. He had an old injury to his shoulder and an old bruise to his lip from being hit by grandmother. The social worker noted how M.H.'s voice trembled while discussing the abuse. M.H. also reported feeling sad when grandmother called him names such as "freak" and "liar." Grandmother became upset after the children spoke to the law enforcement officers the previous day. M.H. reported that grandmother grabbed Jackson and caused a scratch to his lip after the officers left. M.H. rated his safety at eight out of 10 (one being unsafe and 10 being safe). He explained that an aunt living in the home made him feel safe even though the grandmother and aunt yelled during verbal arguments. In reference to grandmother, M.H. stated, " 'She makes me feel like she does not want me.' " M.H. did not know his mother, and he had not seen his father for "a while."

In Jackson's interview, he explained that grandmother would physically discipline him with a belt on the back, legs, and shoulders. He decided to call 911 the previous day because grandmother repeatedly called M.H. a "freak" and "liar." Jackson believed grandmother sprained his leg after she hit him until he was unable to get off the ground near the time of his last birthday. Jackson had black marks from being hit with the belt on a few occasions, and grandmother scratched his lower lip after the officers left on the previous day. On the same safety scale from one to 10, Jackson rated himself at a zero out of 10 for "not safe." Jackson indicated his preference for "juvie or a foster home" over grandmother's home. It was estimated that Jackson was hit by grandmother five to 10 times per week while M.H. was hit once per week.

Prior to the completion of Jackson's interview, grandmother interrupted to have M.H. come into the home for a shower. The children's aunt refused to provide a

3.

statement to the social worker regarding the allegations, and she claimed the children were safe without need of any services. The children were ultimately placed into protective custody by one of the officers due to concerns that grandmother injured Jackson for calling law enforcement the previous night. Grandmother initially prevented the officers from taking M.H. from the home. M.H. reported that grandmother asked him to tell the officers and social workers that he wanted to remain at grandmother's home. M.H. also indicated that he and Jackson sometimes "deserved whoopings." The social worker explained to M.H. that she would locate a home where they would not be physically punished.

On January 24, 2022, a social worker informed the children's father, I.H., III (father), of their removal. Father was surprised by the news and began to cry. He described his prior attempt to regain custody of the children about five years earlier, but he claimed his mother (grandmother) moved to Kings County to stop him. Father reported that he maintained contact with the children and saw them a couple weeks prior. He recently obtained custody of I.H., IV, the children's sibling (sibling), after he requested to live with father. Law enforcement had to assist father in retrieving the sibling from grandmother's home because she refused to allow the sibling to leave. The sibling's guardianship case from San Diego County was set for a hearing where father intended to move to terminate the legal guardianship of the children. The children recently began calling father almost 10 times each day.

Father claimed grandmother was lying when she accused father of hitting the children. Grandmother obtained a restraining order protecting the children and herself from father, but M.H. was no longer protected by the restraining order. The restraining order was filed by grandmother based upon allegations that father slammed her on the ground in March 2021 and hit the children with a belt in July 2021.

Grandmother became upset when the social worker contacted her to provide notice of the detention hearing. She denied knowing why the children were removed, and she

claimed that she had always taken care of the children since they were born. Grandmother reported that the children needed daily medication for their seizures and epilepsy, but she refused to allow anyone from the agency to get any medication from her home. Grandmother ended the conversation after telling the social worker that they had to "figure it out," and "those little n*****s can fen[d] for[] themselves." The care provider agreed to take the children to the hospital due to the alleged epilepsy conditions, but the children denied that they had seizures. M.H. also informed the care provider that he wanted to return to grandmother.

The agency filed a petition alleging the children were described by Welfare and Institutions Code section 300, subdivisions (b)(1) and (g).[1] The petition alleged the children were at substantial risk of suffering serious physical harm as a result of grandmother's physical discipline of the children. The petition further alleged the children were left without any provision for support due to mother's whereabouts being unknown. At the detention hearing held on January 26, 2022, grandmother and father were both present and appointed counsel. All parties submitted on the agency's report, and the juvenile court ordered the children removed from the grandmother's custody.

After their initial removal, the children went through four placement changes due to their behaviors and allegations of abuse in each of their foster homes. The children's behaviors consisted of running away from their care providers' home, aggression toward care providers' children, threatening to make false reports of abuse against care providers, and damaging property. According to the children's first care provider, the children made statements that they intended to report abuse in order to return to their grandmother's home. The children informed their social worker that they no longer

---

[1]      All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

wanted to get "whooped" by their grandmother, but they loved her and wanted to return home.

The children were placed in separate homes after they made threatening statements to each other such as "I am going to kill you." M.H. told social workers that he wanted to return to grandmother's home, and he made threats to run away from his placement until he was returned to grandmother. Jackson was initially willing to return to grandmother's home if the agency assisted her in no longer using physical discipline. However, he then claimed he wanted a restraining order because he never wanted to see her again.

The social worker contacted the grandmother at her home on February 1, 2022, to introduce herself as the ongoing social worker. Grandmother explained that the children previously received counseling and behavioral services through a provider in San Diego. The children were enrolled in regional center services, occupational therapy, and physical therapy until services stopped at the start of the COVID-19 pandemic in February 2020. Grandmother reported that she decided to home school the children to keep them safe from being exposed to COVID-19.

The children were diagnosed with Attention Deficit Hyperactivity Disorder (ADHD), Fetal Alcohol Syndrome (FAS), and epilepsy. M.H. was diagnosed with Cerebral Palsy, and the children were not taking any medication to manage their behaviors. Grandmother claimed she was able to manage the children's behaviors with constant supervision, stimulation, structure, boundaries, and organization. The social worker observed that the children's learning materials and medication were organized. Grandmother was concerned for the children's medical and educational needs, and she did not want the children attending school in person due to them being immunocompromised.

Grandmother claimed Jackson called law enforcement on the day before their removal because "he did not get his way and was upset." Jackson was eating "like a wild

6.

animal" and making noises while the children were racing each other to finish their dinner. Grandmother informed the children their behavior was unacceptable, and she told M.H. to "stop acting like a freak," after he put his plate above his head and scraped the dessert off his plate. Jackson became upset and yelled at grandmother to stop calling M.H. a "freak." Grandmother sent Jackson to his room and did not allow him to watch television because he yelled at her.

Grandmother denied that she hit Jackson on that night. However, she acknowledged that she had spanked the children on the buttocks with a belt in the past. She explained that she last spanked them in October or September of 2021, and she denied ever leaving marks or bruises on the children. Grandmother claimed to be unaware that she was not able to use objects to spank the children, and she would no longer spank the children with objects in the future.

Grandmother participated in supervised visits for the period of time that the children were in foster care. During grandmother's first visit, both children became upset, yelled, and walked out of the visitation room. On February 2, 2022, grandmother had a visit with the children while the agency attempted to secure a new placement for each of them. Grandmother attempted to engage the children in conversations and appeared to be affectionate towards the children. Jackson left the room after grandmother redirected his negative behavior, and he stated, "I don't want you to let her … come into the room."

The children's sibling, who was nine years old and living with father, was interviewed by a social worker on February 4, 2022. Sibling lived with grandmother for almost his entire life, and he asked to return to his father the previous year. Sibling explained that grandmother's home "wasn't good for us" because they had no interaction with other kids, attended school via Zoom, and were only allowed to play in the front yard if no one else was outside. Grandmother would send children to their room, put them in the corner, or take away video games if they misbehaved. Sibling reported that

for "certain things" grandmother would "whoop" them with the long part of the belt "everywhere besides the head," but grandmother would not "whoop" them often. Sibling never received marks or bruises from being "whooped." However, he remembered Jackson receiving a mark between his left shoulder and elbow because he was "the baddest." The children's aunt would stop grandmother from "going crazy" on them. He did not feel safe with grandmother, and he reported feeling safe with father. Sibling did enjoy being with grandmother because they baked cookies and ate them at lunch time.

At an interim review hearing held on February 8, 2022, the agency requested that the juvenile court grant it discretion to return the children to grandmother's care under specific terms and conditions. The agency made the decision after determining that grandmother had the necessary tools to address their medical, educational, developmental, and behavioral needs. Grandmother would allow the agency and children's attorney to conduct in-person unannounced visits to ensure the children's safety.

## B. Jurisdiction Hearing

The agency's jurisdiction and disposition report, dated February 28, 2022, recommended that the allegations in the petition be found true, the children remain in grandmother's custody with family maintenance services, and the father be provided with family reunification services. Mother's whereabouts remained unknown, but reunification services were recommended if she made an appearance.

M.H. was returned to grandmother's home on February 9, 2022. A meeting was held on February 16, 2022 to discuss Jackson's return to grandmother's home. Jackson's clinician and support counselor were present with Jackson at the meeting. Jackson initially told the social worker that he did not want to go back to grandmother's home and threatened to leave the meeting. Upon the arrival of his grandmother, aunt, and uncle, Jackson began to yell, "I don't want to see you, I don't love you, I don't even miss you" towards grandmother. Jackson claimed he felt that way because grandmother's discipline

8.

is harsh and he did not know what he was doing at times. Grandmother apologized to Jackson, and she told him that she loved and missed him. Jackson agreed to return to grandmother's home before changing his mind again. Jackson became violent toward the social worker and made threatening statements to grandmother. Jackson began crying after he left the visitation room, and he agreed to return to grandmother's home. Jackson was transported to grandmother's home without further incident after the meeting concluded.

The agency's report included descriptions of the child welfare investigative history involving the children. Past referrals in San Diego County from 2013 to 2018 involved reports of domestic violence between mother and father and physical abuse of the children's sibling by grandmother. In March of 2021, law enforcement observed grandmother and father in a verbal altercation in Jackson's presence. A few days later, it was reported that father and his girlfriend were involved in a physical altercation while the children were inside the home.

Over the next several months there were five separate referrals regarding father that were ultimately determined to be unfounded. Four of them involved allegations of general neglect of the sibling by father as a result of his leaving the sibling unsupervised and engaging in domestic violence altercations in the sibling's presence. A July 2021 referral investigated allegations that father beat Jackson with a belt, which were referenced in grandmother's prior restraining order request. Law enforcement responded to the home and determined Jackson had no visible injuries.

In December 2021, the agency received a referral alleging grandmother hits the children and caused M.H.'s lip to bust open a couple of months earlier. During the investigation, grandmother indicated M.H. busted his lip at father's home, and M.H. described a verbal and physical altercation he witnessed between grandmother and father. M.H. stated grandmother grabbed and pushed him toward the gate after he indicated his

desire to stay at father's home with the sibling. M.H. busted his lip on the gate after grandmother's push, which resulted in father slamming and grabbing grandmother.

The report also included descriptions of father and grandmother's criminal history. Grandmother had convictions for trespass, fraud, perjury, driving under the influence, and driving with a suspended license. Father's convictions involved trespass, false identification to peace officers, driving without a license, obstruction of a public officer, and driving with a suspended license.

During the social worker's family assessment, grandmother expressed her disagreement with the agency's intervention. Grandmother believed the children were only removed as a result of her refusal to cooperate with law enforcement. She also claimed Jackson called 911 because she would not let the children play with neighbors who did not wear a mask. Grandmother denied ever abusing the children, and she expressed her willingness to cooperate with the agency's efforts to return the children to her care. Grandmother claimed she would rely on alternative disciplinary methods for the children such as redirecting their negative behavior, sending them to their room for a time out, removing their electronics, watching church movies, or reading children's books on discipline or lying.

Father informed the social worker that he was disciplined by his parents with a belt, but he did not believe that the "whoopings" were in an abusive manner. As a last resort, father acknowledged that he would spank his own children with a belt without leaving welts, marks, or bruises. Father believed the children should have remained in grandmother's care and that the children's separation from each other was not beneficial. Father reported his last use of illicit substances as approximately 20 years ago, and he denied having any mental health issues. Father told the social worker that he agreed to a legal guardianship for the children when he was "roaming the streets" and unable to care for the children. Father was currently working on himself and trying to get his family back together. In order to regain custody of the children, father believed he would

benefit from family counseling to improve his relationship with the children and grandmother.

In March 2022, the agency filed amended petitions to update the children's status as no longer being detained and correct a typo in the spelling of grandmother's name. At the contested jurisdiction and disposition hearing held on March 17, 2022, grandmother testified regarding her relationship with the children and their significant developmental and medical needs. Both children were developmentally delayed, and Jackson had more violent tendencies.

Grandmother then described the events that led to law enforcement's response at her home in January 2022. She explained how she told M.H. to "quit acting like a freak" after he held his bowl above his head while eating at dinner time. Grandmother believed Jackson called the police because "he couldn't get his way," and she explained how he previously called police 47 different times for the same reason. She did not believe she did anything wrong on the night that Jackson called the police, and she denied ever hitting either of the children in the back of the head or grabbing Jackson by the jaw. Grandmother admitted to using a belt to spank the children without ever leaving a mark. She utilized physical discipline in comparison to the offense the children committed, and she also had the children separate, take a time out, and lose the use of electronics for punishment.

At the close of evidence, counsel made arguments regarding jurisdiction and whether the agency had met its burden to prove the allegations of the amended petition by a preponderance of the evidence. The juvenile court found that the children came within the provisions of section 300, subdivision (b) and sustained the allegations in the amended petition. The disposition portion of the hearing was continued to April 5, 2022, for the children's attorney to speak with the children and conduct an investigation into the father's home.

11.

### C. Petition for Termination of Guardianship and Disposition Hearing

The agency filed an addendum report, dated April 1, 2022, in advance of the continued disposition hearing. The social worker visited the grandmother's home on a weekly basis, and she observed grandmother redirect the children in an age-appropriate manner. Grandmother had concerns that the children acted out when they did not get their way, and the paternal aunt believed the children had the impression that they could get grandmother in trouble by speaking to the social worker when they did not get their way. M.H. told grandmother that one of the children had to leave the home, and Jackson made threats to leave grandmother's home.

During a meeting with the agency, the social worker noted concerns that grandmother was intervening during the children's Full Service Partnership (FSP) sessions. Grandmother responded that the social worker was lying, and she denied ever intervening in the service providers' sessions. Grandmother was receptive to scheduling various assessments to address the children's behavioral, mental health, and developmental needs, and she agreed to meeting with the FSP team outside of grandmother's home.

At a home visit on March 4, 2022, M.H. expressed his desire to leave the home if Jackson continued to live in the home, but grandmother was able to redirect M.H. by having him engage in another activity. The following week, M.H. complained that he had to vacuum the living room and play outside for an hour. M.H. told the social worker that he wanted to leave grandmother's home, and he felt he would be better off in foster care.

On March 18, 2022, Jackson's behavior was self-reported as "good," and the children were not fighting as often. M.H. claimed Jackson was being nicer to him because they were spending more time apart. The children expressed no concerns or needs to the social worker. Grandmother stated Jackson's behaviors were stabilized, but M.H. would become upset when Jackson did not pay attention to him. Grandmother was

coordinating the children's various appointments and in the process of enrolling the children in school and community activities.

Later that day, the agency received a referral after M.H. ran away from grandmother's home and banged on the door of the reporting party. M.H. told the reporting party that Jackson was attempting to sexually abuse him and grandmother was going to spank M.H. M.H. was not able to provide any details and only stated that Jackson was getting "freaky" with him. M.H. was telling everyone a different story regarding the reason that he ran away from the grandmother's home. The reporting party did not believe M.H.'s stories added up. M.H. was supposed to be playing in the backyard with Jackson, but he ran away from home when Jackson went inside.

M.H. denied the sexual abuse when law enforcement arrived, and grandmother was in front of the home looking for M.H. when he was brought back home. Upon the social worker's arrival, M.H. disclosed that Jackson abused him by hitting and bashing him. Grandmother was not aware of Jackson's hitting, and M.H. did not want to tell grandmother because he believed she always takes Jackson's side. M.H. stated he wanted to go to foster care or have his brother leave the home.

On March 22, 2022, Jackson appeared to be happy and reported he was doing "good" during the social worker's home visit. M.H. informed the social worker that he wanted to leave the home because Jackson still lived there, and he denied getting a "whooping" after he ran away from the home. Grandmother reported she enrolled the children at an in-person school with specialized programs for children with special needs.

The social worker contacted father, sibling, and father's partner T.T. at father's home on March 30, 2022. Father's home appeared to be clean and furnished with plenty of food. Father explained that guardianship of M.H. was provided to grandmother at the time of M.H.'s release from the hospital after a child welfare investigation. Father reported that he saw the children often, and he interacted with them while the paternal aunt would babysit them. Father claimed grandmother prevented him from knowing

13.

about the children's medical and emotional needs. He believed the children's diagnoses were "not as bad as they say they are." Father suggested grandmother was "handicapping" the children by going to several providers until she received the "diagnosis or answers" that she wanted to hear.

Father attended Individualized Education Plan meetings for the sibling, and he was able to connect with the school to obtain community resources. Father recently started a new job, and he had access to Temporary Assistance for Needy Families (TANF). Father and T.T. had been in a relationship for four years. T.T. helped care for sibling, and she stayed home to care for her and father's younger children. T.T. described father as being family oriented and a stable parent, and she had no concerns with his ability to care for the children.

Sibling told the social worker that he was doing well in father's care and he had a good relationship with father. Sibling had no concerns, worries, or fears while residing in father's care. Sibling wanted to have visits with the children, but he was not worried for the children because he felt it was "a matter of time before they return home."

The agency continued to recommend that the children remain in grandmother's care, but it also requested that the restraining order be modified to allow supervised contact between Jackson and father. At the continued disposition hearing held on April 5, 2022, the attorneys for the children and father each requested a contested hearing, which was set for May 5, 2022. The children's attorney intended to present evidence bearing on substantial risk to the children, and it had completed an investigation of father's home in San Diego. Father's counsel did not believe the children were safe in grandmother's care, and she commented that "grandmother continues to thwart the process .…"

On April 12, 2022, the children's attorney filed petitions to terminate grandmother's guardianship of the children. The petition alleged that termination was in the best interests of the children because "the guardian has acted in bad faith with respect

to the child[ren]'s interest in a relationship with [their] father and [sibling]; it appears the child[ren]'s father is able to provide a safe home for the child[ren], and that [father] desires to do so now." The investigator's report and an email from the sibling's attorney were attached to the petitions.

According to the investigator's report, father and the sibling's mother agreed to let grandmother provide temporary care for the sibling shortly after his birth. Grandmother obtained guardianship of sibling due to father's unstable lifestyle. Father was prevented from taking sibling out of state after grandmother reported father for kidnapping sibling when he was approximately one year old.

Grandmother obtained guardianship of M.H. in order to authorize medical care with the agreement of father and mother. Father was absent while he was working various jobs, and grandmother "pushed back" when father felt prepared to take care of his children. Father alleged grandmother obtained guardianship of Jackson by default based upon a forged proof of service. Father attempted to regain custody of sibling in 2018, but he claimed grandmother moved to Lemoore to hinder the process. Sibling returned to father's care in 2020 after grandmother and sibling had a "falling out."

Father continued to be involved in the children's lives while they were in grandmother's care. He claimed grandmother dropped the children off at his home for weeks at a time. However, father also suggested grandmother would attempt to push him away from the children. He also reported concerns with grandmother's discipline of the children by alleging that she was "beating them" in the same manner that she parented him.

Father was also concerned that grandmother had a drinking problem, and he believed she kept the children out of school to conceal any possible abuse. He also believed grandmother taught the children how to manipulate the child welfare system in order to "get their way." Father insisted that he was prepared for the children to return to his home and that he had the means and support to care for the children.

15.

Sibling informed the investigator that he hoped the children would be allowed to return to father's home. He reported that grandmother "is not all there" and often lies, and she did not require him to complete any school assignments. Sibling stated that grandmother had a bad temper and often hit him and the children with a belt for minor things. He also felt that grandmother manipulated the children by telling them they "would straight up die" if they had contact with anyone outside of grandmother's home during the COVID-19 pandemic. Sibling was happy to be back in father's home and in school.

Father's relationship with T.T. recently ended; however, they continued to co-parent their two children. T.T. supports father by caring for sibling while father works. T.T. reported having observed grandmother lie and manipulate father and the children. She also alleged grandmother forged a proof of service to obtain guardianship of the children and moved to Lemoore to interfere with father's attempt to regain custody of the children.

T.T. observed grandmother to have a drinking problem when she lived with father, and she also saw grandmother use a belt on the children's face, arms, and legs for discipline. T.T. never saw the children complete any schoolwork during the time she visited grandmother. T.T. planned to care for the children while father was at work if they were returned to father's home. T.T. would call father when the children acted out because she believed he knew how to calm the children down.

The attorney representing sibling in his probate guardianship case described grandmother's attempt to enforce a restraining order from a different court after the probate court ordered sibling placed with father pending a trial. The other restraining order was eventually dismissed, and the probate court terminated grandmother's guardianship over the sibling in August 2021. Grandmother continued to file restraining orders to obtain custody of sibling, but sibling was eventually returned to father's care.

16.

On April 19, 2022, the agency filed a request to modify the restraining order protecting Jackson from father to allow for supervised visitations to occur. Temporary orders were denied pending a hearing that was set for the same date as the contested disposition hearing on May 5, 2022.

In an addendum report dated May 3, 2022, the agency requested a continuance of the contested disposition hearing for further assessment of the appropriate services for the family due to the pending petition to terminate the grandmother's legal guardianship of the children. The report noted additional details from the social worker's home visit on March 22, 2022, after M.H. ran away on March 18, 2022. Grandmother told the social worker that M.H. ran away due to the social worker's statement that Jackson would be removed from the home if the children were not able to get along. The social worker denied making that statement and provided clarification. However, grandmother called the social worker a liar, and grandmother wished to discontinue the children's FSP services. The social worker noted that grandmother slammed the front door as the social worker left the home.

At a home visit on April 4, 2022, grandmother expressed her disagreement with the agency's request to modify the restraining order, and she refused the social worker's attempts to arrange virtual visits between father and the children. The social worker noted that grandmother slammed the door shut.

On April 8, 2022, grandmother did not want to talk to the social worker because she believed the social worker was a "liar." After expressing her disagreement with the agency's recommendation to provide father services, grandmother stated, "you are out there going to San Diego to meet with that n*****." The social worker then explained that the agency was "attempting to work with [grandmother] to have the children remain in her care but due to challenges with her cooperation with the [a]gency and Court orders, it is difficult to assess and ensure the children will receive the necessary services to remain safely in her care." Grandmother informed the social worker that she had not

been able to re-enroll the children in school because it was the middle of the school year. The social worker obtained information to assist with grandmother's efforts to re-enroll the children, but grandmother indicated she would talk to her attorney prior to enrolling them in school.

Grandmother told the social worker that she would not attend parenting classes until father did after the social worker asked if she was attending parenting classes. The social worker noted that grandmother slammed the door as the social worker was leaving.

The social worker met with Jackson outside of grandmother's home on April 13, 2022. Jackson told the social worker he did not want to speak with her because she was meeting with his father. The report stated that Jackson did not want to return to his father's care because "he whoops them and yells at them." Jackson emphasized that he would not go to his father's home even if the juvenile court ordered him to go. He also threatened to run away if he was returned to his father's care. Jackson provided a confusing statement when asked to identify the reason he did not like his father.

M.H. told the social worker that he would choose foster care because he did not want father or grandmother to feel betrayed. M.H. was "fine" living with grandmother, and he wanted to get along with his brother. He described a verbal argument with grandmother two weeks earlier after she discovered statements that M.H. made to the social worker. M.H. asked the social worker to tell grandmother that he was "fine" because he did not want to upset grandmother.

On April 15, 2022, virtual visits began between M.H. and father with no noted concerns during the visit. M.H. and father had appropriate conversations, and M.H. interacted with sibling, and younger half siblings during the last 10 minutes of the visit. The children also participated in virtual visits with sibling.

During a meeting with the social worker on April 20, 2022, grandmother expressed concerns of domestic violence in father's home, and she alleged father and

T.T. had an active restraining order. Grandmother claimed she had proof of ongoing abuse in father's home, and she agreed to provide documents to the social worker.

Grandmother informed the social worker that the children were not available during an unannounced home visit on April 29, 2022. Grandmother clarified that all weekly contacts were not to be conducted as unannounced based upon an advisement from her attorney.

The children's school records reflected 27 absences for Jackson, 30 absences for M.H., and poor academic performance for both children from August 2021 through January 2022. The children were participating in mental health services through the KIND center after grandmother declined further services through the FSP program. Jackson was attending all of his weekly counseling sessions through the KIND center, and the rehabilitation specialist had not identified any concerns in the early stages of his treatment. Jackson's rehabilitation sessions took place at a local park, and the paternal aunt and M.H. accompanied Jackson to the sessions. M.H.'s intake appointment was rescheduled twice due to missed appointments.

The social worker's assessment identifies grandmother's inconsistent participation in services as a reason that providing reunification services to the father would be in the best interest of the children. The social worker was concerned with grandmother's failure to enroll the children in school, missed appointments to initiate mental health services for M.H., and use of negative terms when speaking of father.

In a declaration attached to the addendum report, grandmother provided a timeline of various court hearings since October 2021. She described an allegation from October 2021 that sibling was injured after being pushed around during father and T.T.'s fight over a gun. There are also references to probate court rulings and domestic violence restraining orders with limited details provided. Grandmother alleged father and T.T. were "wickedly dangerous people who use the children as pawns or weapons in their battle for control of each other." She also stated father was "instable and the exposure to

19.

him is dangerous for all three of my special needs grandchildren…" Grandmother referenced multiple documents that the agency claimed it was unable to attach to the report absent sufficient time to review and verify the documents.

**D.      Contested Disposition and Termination of Guardianship Hearing**

On May 5, 2022, the juvenile court continued the contested hearing on disposition and petitions to terminate guardianship at the agency's request to May 12, 2022. The agency requested a continuance based on its need to provide the juvenile court with "good information regarding the relationship between the father and Jackson as it bears on all of the issues before the Court and without doing some supervised visits the [a]gency [was] at a loss in terms of how to assess or make a recommendation." The juvenile court modified the restraining order involving father and Jackson to allow supervised visitation between Jackson and father despite grandmother's objection to the modification. Grandmother also voiced her disagreement with the children having supervised visitation with father.

The agency prepared an additional addendum report, dated May 10, 2022, which recommended that the children be returned to father's custody on a plan of family maintenance services. It also joined the children's attorney's request that grandmother's legal guardianship be set aside. The social worker transported the children to a visit with father after they each agreed to attend the visit on May 5, 2022. M.H. felt "safe" and was happy to visit father. Jackson felt "good about it," but he did not want the social worker to tell grandmother about his positive feelings. The children also wanted to take pictures with their father without the social worker telling their grandmother. Jackson indicated he wanted to live with father "as long as I don't get a whooping." M.H. and Jackson felt sad that grandmother and paternal aunt did not like the children talking about father. M.H. would have been happy if grandmother and father were able to get along, but Jackson stated, "I would not like that because I wouldn't be able to say my little white lies."

Upon their arrival at the visit, Jackson and M.H. ran toward father to hug and kiss him. The children asked father about returning to his care, and he asked the children if they wanted to return to his care. M.H. responded affirmatively and Jackson again qualified his response by stating "only if I don't get a whooping." Father engaged the children in age-appropriate conversations and actively engaged with them throughout the visit. The children also interacted with their siblings, and father used encouragement and redirection with the children.

In the social worker's assessment of father's relationship with the children, she observed that all of the interactions between the children and father were appropriate without any concerns noted during the visits. Both children were happy to spend time with father and were excited for their next visit. The social worker also believed grandmother was not consistent in her level of cooperation with the agency and ensuring that the children's needs were met. It was also a concern that grandmother would be a barrier to any efforts to reunify the children with father.

At the contested hearing, held on May 12, 2022, regarding the petitions to terminate legal guardianship, request to modify the restraining order, and disposition, grandmother was not present at the start of the hearing. Counsel for all parties agreed to address the petitions to terminate legal guardianship prior to disposition, and counsel for the agency noted that "in some ways, it is dispositive." The children's counsel requested that the parties stipulate that father would testify consistent with his statements in the investigator's report. Grandmother's attorney offered no objection and the juvenile court accepted the investigator's report into evidence.

Counsel for the agency, children, and father each requested that the juvenile court grant the petitions to terminate the grandmother's legal guardianship of the children. Grandmother's counsel explained that he intended to have grandmother testify after their earlier preparation, but he presented argument in opposition to the petitions since grandmother was not present. Her counsel argued that it was not in the children's best

interest to terminate the legal guardianship because they lived with grandmother for most of their lives and had a strong bond with her.

During its rebuttal argument, the agency's counsel acknowledged that grandmother raised the children for the majority of their lives. However, it was argued that grandmother was "increasingly unresponsive" to direction from the agency and her failure to attend the hearing evidenced the "downward trajectory of how things have gone related to her care of the children." The agency was not initially seeking to terminate her guardianship, and there were concerns about where the children were. After hearing argument from counsel and reviewing all reports in evidence, the juvenile court found that it was in the children's best interests to terminate the grandmother's guardianship over the children.

The juvenile court then proceeded to the disposition portion of the hearing. Counsel for the agency and children explained their position that there was not clear and convincing evidence of a substantial danger to the children to prevent the children from being placed with their father. The counsel for the agency, children, and father each requested that the restraining order be terminated and family maintenance services be provided to father. Grandmother's counsel made no arguments as to disposition because any of grandmother's issues on disposition were believed to be moot.

Grandmother entered the courtroom with the paternal aunt as the juvenile court was reciting its orders as to disposition, which was 25 minutes after the hearing was scheduled to begin. The juvenile court then terminated the restraining order protecting Jackson from father, ordered the children placed with father, and provided father with family maintenance services. The case was subsequently transferred to father's county of residence, San Diego County, on May 31, 2022. Grandmother filed a timely notice of appeal on June 10, 2022.

22.

## DISCUSSION

Grandmother contends the juvenile court erred in terminating her probate guardianship of the children under subdivision (a) of section 728. She argues that there was no substantial evidence to support the juvenile court's finding that termination was in the children's best interest. Grandmother further argues that there was no substantial evidence to support a finding that grandmother's home posed a substantial danger to the children pursuant to section 361, subdivision (c).

### A.     Applicable Law

California law recognizes two types of guardianships pertaining to minor children governed by two separate statutory schemes. A guardianship can be established by the superior court, before the commencement of dependency proceedings, under the authority of the Probate Code. (Prob. Code, § 1514; *Guardianship of Zachary H.* (1999) 73 Cal.App.4th 51, 61.) Juvenile courts may also create guardianships under the authority of the Welfare and Institutions Code. (§ 366.4, subd. (a); *In re Heraclio A.* (1996) 42 Cal.App.4th 569, 575.) These two types of guardianships are commonly referred to as "probate guardianships" and "dependency guardianships," respectively. The present case involves a probate guardianship, which was created before the commencement of the current dependency proceedings.

The procedure for terminating a probate guardianship in a dependency proceeding is set forth in section 728 and California Rules of Court, rule 5.620(e). (*In re Z.F.* (2016) 248 Cal.App.4th 68, 73 (*Z.F.*).) The juvenile court may terminate a probate guardianship on the social service agency's motion at any stage in the dependency proceeding. (§ 728, subd. (a) [the hearing on a termination motion "may be held simultaneously with any regularly scheduled hearing held in proceedings to declare the minor a dependent child ..., or at any subsequent hearing concerning the dependent child ...."]; rule 5.620(e); *In re Xavier R.* (2011) 201 Cal.App.4th 1398, 1413 *(Xavier R.)* [recognizing that the

23.

juvenile court has authority to terminate a probate guardianship at any stage in the dependency proceedings].)

A juvenile court must focus on the best interests of the child when deciding whether to terminate a probate guardianship. (*Xavier R.*, *supra*, 201 Cal.App.4th at p. 1416; see also *Z.F.*, *supra*, 248 Cal.App.4th at p. 73; *In re Michael D.* (1996) 51 Cal.App.4th 1074, 1087.) When assessing a child's best interests, a juvenile court may consider, among other factors, "the seriousness of the problem leading to the dependency; the strength of relative bonds between the child and both the parent and the caretaker; and the degree to which the problem may be/has been easily removed." (*In re Jacob P.* (2007) 157 Cal.App.4th 819, 832.)

### B. Standard of Review

We review a juvenile court's order terminating a probate guardianship under the substantial evidence standard. (*In re Merrick V.* (2004) 122 Cal.App.4th 235, 254.) This means, among other things, that we resolve all evidentiary disputes in favor of the juvenile court's rulings and draw all reasonable inferences to support them. (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 450–451.)

### C. Analysis

First, we reject grandmother's contention that the juvenile court erred by applying improper legal standards and failing to make various findings in order to remove the children from grandmother. The juvenile court terminated grandmother's probate guardianship prior to the disposition hearing where custody orders were made in father's favor. Since a probate guardianship may be terminated at any time during the dependency proceedings, even prior to the dispositional hearing, and is governed only by the child's best interests, whether a guardianship should be terminated is not dependent on the juvenile court's findings concerning a substantial danger or reasonable means to protect the children from their former guardian.

24.

Here, the juvenile court terminated the guardianship after finding it was in the children's best interests to do so. Since the guardianship was terminated, the juvenile court was not required to make additional findings regarding a former guardian in order to grant father custody of the children. Grandmother's trial counsel even acknowledged the fact that they were unable to make any arguments as to disposition once the legal guardianships were terminated. Grandmother was no longer the children's guardian such that the provisions of section 361 acted to protect any existing right of custody to the children. (See *A.H. v. Superior Court* (2013) 219 Cal.App.4th 1379, 1393, fn. 6 ["Once the juvenile court terminated [the] Grandmother's probate guardianship, the clear and convincing evidence standard under section 361, subdivision (c), no longer applied."].)

The juvenile court appropriately conducted the disposition hearing by granting father custody of the children after grandmother's legal custody of the children ceased by operation of law. At the time of the disposition hearing, grandmother was no longer the children's guardian and had no legally cognizable interest in whether the juvenile court placed the children with father. Accordingly, grandmother fails to demonstrate that the juvenile court was required to make any additional findings prior to its termination of the legal guardianships or otherwise erred when it placed the children in father's custody.

Next, grandmother argues that the juvenile court was required to find by clear and convincing evidence that termination of the guardianship was in the children's best interests because the agency joined in the requests of the children and father. In support of this argument grandmother cites to this court's decision in the case of *In re Priscilla D.* (2015) 234 Cal.App.4th 1207, 1218 (*Priscilla D.*), which held that a parent seeking to terminate a dependency guardianship under section 388 need only show termination is in the child's best interest and "does *not* have to show that the guardianship is detrimental to the children." However, an agency was still required to show that "the child will suffer detriment by clear and convincing evidence before the department can remove the child from the guardian and initiate termination of the guardianship." (*Priscilla D.*, at p. 1218.)

The *Priscilla D.* court's holding is not applicable to the present case. Here, the petitions to terminate the children's legal guardianship were filed by the children's attorney. Both the agency and father were in support of the petitions and made arguments that they be granted, but they were not the parties that made the formal motion to initiate a termination of the guardianship. (See *Decker v. U.D. Registry, Inc.* (2003) 105 Cal.App.4th 1382, 1391 [although "standard practice" permits parties to join in each other's arguments, "joining in an argument is different from joining in a motion"].)

The juvenile court's ruling concluded that termination of the legal guardianship was in the children's best interests without articulating which standard of proof it was applying. "Because Welfare and Institutions Code section 728, Probate Code section 1601 and [California Rules of Court,] rule 5.620 are silent with respect to standard of proof, the default standard of preponderance of the evidence applies." (*In re Z.F.*, *supra*, 248 Cal.App.4th 68, 74.) Therefore, "where, as here, the juvenile court is terminating a probate guardianship pursuant to section 728, the best interests of the minor finding need only be made by a preponderance of the evidence." (*Ibid.*) Even accepting grandmother's argument as to the application of a heightened standard of clear and convincing evidence, we believe the juvenile court's finding was supported by substantial evidence under either standard of proof.

Finally, we address grandmother's contention that the evidence was insufficient to support the juvenile court's finding that termination of the legal guardianships was in the children's best interests. Grandmother argues that termination of the legal guardianships was not in the children's best interests because (1) grandmother provided stability for the children; (2) the children's bonds with grandmother were disrupted; (3) grandmother did not fail to supervise the children; (4) grandmother met the children's mental health and educational needs; (5) grandmother's conflict with the social worker did not affect the children; and (6) grandmother would no longer engage in unreasonable discipline.

26.

In doing so, grandmother essentially requests that we reweigh the evidence by only considering the evidence in a light that is favorable to her. However, "[w]e cannot reweigh the evidence; we must view the evidence in the light most favorable to the judgment, giving every reasonable inference which could be drawn from the evidence in support of the judgment. If there is any substantial evidence which supports the trial court's ruling, we must uphold the order. [Citation.]" (*Guardianship of M.S.W.* (1982) 136 Cal.App.3d 708, 711.)

The best interest of a child is a "complex idea." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 530 [discussing best interests in the context of a section 388 petition].) A "one-dimensional 'better household' test is not dispositive" and many factors must be considered. (*In re Kimberly F.*, at p. 530.) Typically, a court begins by examining "the seriousness of the reason for the dependency in the first place." (*Ibid.*) Here, the dependency proceedings were initiated as a result of grandmother's inappropriate discipline of the children. Grandmother acknowledged that she utilized a belt to discipline the children, but she denied ever leaving marks on the children.

The filing of the petition was preceded by months of back-and-forth allegations that both grandmother and father were either involved in altercations with each other or abusing the children. Father had recently regained custody of sibling after a "falling out" with grandmother, and the children were beginning to call father multiple times per day. The children were well aware of the fact that they could manipulate the volatile relationship between grandmother and father by making false reports of abuse. After going through four foster placements due to the children's behaviors and unfounded reports of abuse against care providers, the children were returned to grandmother's home. Although there were no additional reports of inappropriate discipline by grandmother, she continued to involve the children in her dysfunctional relationship with father by discouraging the children from speaking positively of their father and interfering with the scheduling of father's visitation.

It is important to acknowledge that the children had a long-standing relationship with grandmother as their primary care provider for the majority of their lives.  However, there is no indication in the record that the children were so bonded to her that they would be harmed by termination of the legal guardianship.  (See *In re Randalynne G.* (2002) 97 Cal.App.4th 1156, 1169 ["What is in the best interests of the child is essentially the same as that which is not detrimental to the child."].)  We find support for this conclusion in the fact that the children's sibling had also lived with grandmother for most of his life, but he was found to be enjoying his time in father's care after recently returning to his custody.  Father had been able to maintain a relationship with the children over the years, and the children interacted positively during visits with father and his family.  The children's bond with grandmother was more established than father's, but the children's relationship with grandmother was complicated by her disapproval of their developing relationship with father.  Such disapproval resulted in M.H. informing the social worker that he preferred foster care over the home of father or grandmother because he did not want to betray either of them.

In addition, we must also consider that father's custody was not interrupted by dependency proceedings.  Grandmother obtained legal guardianship of the children through probate proceedings, where "[i]t is the family members and the guardians who determine, with court approval, whether a guardianship is established, and thereafter whether parent and child will be reunited, or the guardianship continued, or an adoption sought under [Probate Code] section 1516.5."  (*Guardianship of Ann S.* (2009) 45 Cal.4th 1110, 1122.)  With an appropriate consideration of this fact, "the juvenile court is in the best position to decide the means most likely to lead to stability and permanency in these children's lives …."  (*In re Jessica C.* (2007) 151 Cal.App.4th 474, 484.)

Accordingly, the children's interest in permanency and stability must still be balanced against the statutory preference for family reunification.  (See § 202, subd. (a) [a primary objective of the juvenile court law is "to preserve and strengthen the minor's

28.

family ties whenever possible"]; see also *In re Marilyn H.* (1993) 5 Cal.4th 295, 309 ["The parent's interest in having an opportunity to reunify with the child is balanced against the child's need for a stable, permanent home. The parent is given a reasonable period of time to reunify and, if unsuccessful, the child's interest in permanency and stability takes priority."].)

The present record establishes that grandmother tried to interfere with the children's visitation and bonding with father. This suggests the children's best interests would not be served by maintaining the legal guardianship where father had finally reached a place of stability in his life. The reports of both the agency and children's attorney indicated that father's home was appropriate and the other children living in the home were well cared for without any signs of abuse or neglect. Initially, the focus of the dependency case was to allow the children to remain in grandmother's home while father participated in reunification services. Grandmother repeatedly and explicitly expressed her disagreement with any plan to return the children to father. The children informed their social worker that grandmother did not approve of the children speaking about their father, and each of the children was afraid that the social worker would tell grandmother that they were happy to visit with father.

Allowing the children to remain in grandmother's home while father sought to progress in his visitation with the children would have exposed them to grandmother's longstanding pattern of making unsubstantiated claims of abuse against father. (See *In re A.J.* (2011) 197 Cal.App.4th 1095, 1106 [substantial evidence supported removal from the mother who repeatedly made false allegations of the father to obtain custody of their child, and the mother never recognized her bad behavior or expressed a willingness to change]; see also *In re Christopher C.* (2010) 182 Cal.App.4th 73, 85 [findings of emotional harm upheld where children were "utilized as weapons in an ongoing familial fight"].) In fact, the children had already adopted grandmother's technique by making false reports of abuse against various care providers to achieve their goal of returning to

grandmother's care.  Father strongly believed that grandmother taught the children how to manipulate the child welfare system despite the claims contained in grandmother's declaration that father was the person using the children as "pawns or weapons" in a battle with T.T.  This provides a strong inference that the juvenile court afforded father's claims against grandmother with more merit when it chose to terminate the guardianship in the face of this conflicting evidence.

In sum, it was in the children's best interest to be raised in father's home to allow them to be reunited with their father, sibling, and other half siblings.  There is no indication that grandmother was pursuing an adoption such that a more permanent placement would be achieved.  Thus, the juvenile court determined that father provided the children with the best option for their long-term emotional health and stability.  The juvenile court retained its jurisdiction over the children to monitor the children's progress in father's home, which allowed the agency to ensure that their needs would be met.  Therefore, we can reasonably conclude that there was substantial evidence that terminating the grandmother's legal guardianships was in the children's best interest.

## DISPOSITION

The orders appealed from are affirmed.

LEVY, Acting P. J.

WE CONCUR:

POOCHIGIAN, J.

DETJEN, J.

30.